# EXHIBIT D

ANTHONY W. SMITH,

        Plaintiff,

v.

BNSF RAILWAY COMPANY.

        Defendant.

1:16-cv-01078-EEC-SEC

## DECLARATION OF WILLIAM L. YECK

1. My name is William L. Yeck. I am a Director, Labor Relations for BNSF Railway Company (BNSF). I have worked for BNSF since November 1994, in Labor Relations since February 1998. This declaration is true and correct and is based on my personal knowledge.

2. As a Director in Labor Relations, my primary job is bargaining and contract administration between BNSF and the bargaining representatives for employees working in Operating crafts, which includes engineers, conductors, brakemen, and switchmen. Those operating crafts are directly involved in the actual movement of freight trains. The engineers are represented by the Brotherhood of Locomotive Engineers and Trainmen (BLET).

3. From my tenure in Labor Relations and my job duties representing BNSF in arbitration, I am familiar with the arbitration awards at issue in this case. I am also familiar with the way the principles of offset and double-recovery have been viewed over the years by Railway Labor Act (RLA) arbitrators.

1

4.   Attached to BNSF's Appendix in Support of its Motion to Dismiss at 4 and 5 are true and correct copies of the BLET's submissions in Mr. Smith's two NRAB proceedings.

5.   For more than a decade, BNSF and several unions have had disagreement over whether BNSF may use outside earnings to offset (or decrease) back pay awards. Rail unions have had similar disagreements with other carriers.

6.   While there is arbitral authority on both sides of the issue, the more-recent authority weighs squarely in favor of the common law rule of allowing offset to avoid providing the reinstated employee a windfall or double recovery.

7.   Attached to BNSF's Appendix in Support of its Motion to Dismiss at 6-1 through 6-8 are 8 arbitration awards – across a variety of railroads and railroad unions – accepting the offset principle. In all of the attached awards involving BNSF and the offset issue, the CBA at issue was silent on the issue of offset, just as the CBA is here.

8.   Moreover, there is an arbitration decision allowing offset in an Award involving the *very same* BLET collective bargaining agreement (CBA) that is at issue in Mr. Hyland's claim: the BLET-BNSF CB&Q Agreement. In addition, there is another very recent Award – decided November 29, 2012 – where Referee Clauss allowed BNSF offset over the objections of another union. Copies of the awards allowing for offset under the CB&Q CBA and the recent Arbitrator Clauss Award interpretation are attached hereto as Exhibits 6-1 and 6-2.

2

9. I declare under penalty of perjury that the foregoing is true and correct.

Signed the 17th day of February, 2016.

William L. Yeck

# Tab 6-1

National Railroad Adjustment Board, First Division - Interpretation No. 1 to Award No. 26368

# NATIONAL RAILROAD ADJUSTMENT BOARD
## FIRST DIVISION

## INTERPRETATION NO. 1 TO AWARD NO. 26368

### DOCKET NO. 46152

**NAME OF ORGANIZATION:** Brotherhood of Locomotive Engineers and Trainmen

**NAME OF CARRIER:** BNSF Railway Company

On November 2, 2006, the Board issued the Award in this case, partially sustaining the claim and formulating the following remedy:

> "Based upon all of the foregoing, this Board concludes that the Claimant must be reinstated to his former position without loss of seniority or other rights and benefits, made whole in all respects and his record adjusted to show a 30-day 'overhead' suspension rather than a dismissal. The reinstatement of this Claimant to employment once again brings to the surface an apparently never-ending dispute between these Parties concerning whether the Carrier is entitled to offset against a reinstated employee's monetary damages those monies earned from other sources of employment during the period of wrongful dismissal. Each of the Parties thoroughly briefed that issue and provided prior countervailing decisions for our consideration in this case. After exhaustive analysis and careful consideration of all of these antecedent decisions concerning the deduction of outside earnings in computing 'make-whole' damages, especially those involving these same Parties, we endorse and adopt as dispositive of that issue in this case the thoughtful analysis and persuasive reasoning of Arbitrator Edwin H. Benn in Interpretation No. 1 of First Division Award 25971."

By letter dated December 4, 2006, the BLET General Chairman filed a "Request for Interpretation of Award 26368," which reads as follows:

"Award No. 26368, Docket No. 46152 was adopted by the First Division on November 2, 2006 with D. E. Eischen sitting as Referee. The Organization requests clarification on two parts of the Award.

The Referee references a 'never-ending dispute between these Parties' concerning the issue of outside earnings offsets. He further notes that the Parties provided 'prior countervailing decisions' for the Board's consideration. As this was the first time that the 'Parties' brought this issue to the First Division, and the Carrier did not provide prior countervailing decisions, the Organization desires an Interpretation of the Award to clarify the Referee's reliance on these elements of the dispute that may have concerned other committees from other former properties and may have been cited in error.

Secondly, in making the Claimant whole, Referee Eischen relied on the common law of damages doctrine to allow the Carrier to off-set the Claimant's back pay with his interim earnings. The Award is silent with respect to the application of that doctrine to the balance of the remedy, and the Organization desires an Interpretation of the Award to clarify the Referee's reliance on and application of that doctrine in formulating the remedy therein."

The matter was set down for Hearing on March 10, 2008, at which both the Organization and the Carrier appeared and were accorded full opportunity to present written Submissions, oral argument and voluminous documentary support for their respective positions. The record was then held open for another 30 days for receipt of additional documentary evidence, all of which was carefully considered and analyzed in formulating the Board's response to the Organization's Request for Interpretation.

Our starting point in this analysis is the Board's firmly established principle that the proper objective of an Interpretation is to clarify provisions of the Award which might be ambiguous; it is not designed to provide a forum for either side to reargue the case or to offer new evidence or contentions. See Interpretation to Award 21446 (Referee Don E. Hamilton, 1968) Interpretation to Award 23814 (Referee David P. Twomey, 1988) Interpretation to Award 23904 (Referee John C. Fletcher, 1991)

Interpretation No. 1 to Award 25201 (Referee Robert E. Peterson, 2003). See also Serial No. 389, Interpretation No. 1 to Third Division Award 36033 (Referee Nancy Faircloth Eischen, 2003).

In pursuit of its first request, supra, the Organization challenged the Board's ruling that the Carrier is entitled to offset against the reinstated Claimant's monetary damages those monies he earned from other sources of employment during the period of wrongful dismissal. However, there is nothing even remotely ambiguous or unclear in the following explanation by the Board of its reasons for doing so in this case:

> "Each of the Parties thoroughly briefed that issue and provided prior countervailing decisions for our consideration in this case. After exhaustive analysis and careful consideration of all of these antecedent decisions concerning the deduction of outside earnings in computing 'make-whole' damages, especially those involving these same Parties, we endorse and adopt as dispositive of that issue in this case the thoughtful analysis and persuasive reasoning of Arbitrator Edwin H. Benn in Interpretation No. 1 of First Division Award 25971."

Instead of being a "request for interpretation" of any asserted ambiguity or lack of clarity in the foregoing ruling, the Organization's presentation at the March 10, 2008 Hearing turned out to be re-argument of the backpay offset issue which was firmly and finally decided in Award 26368 by the Board's endorsement and adoption of "the thoughtful analysis and persuasive reasoning of Arbitrator Edwin H. Benn in Interpretation No. 1 to First Division Award 25971." In the final analysis, the Organization tried to convince the Board to recant and effectively reverse Arbitrator Benn's Interpretation No. 1 to First Division Award 25971, on the basis of arguments previously advanced in its Dissent to Award 25971 and renewed here under the guise of an "Interpretation" of Award 26368. That third bite at the apple must be rejected as inconsistent with the Board's consistently applied principles concerning the proper use and function of Interpretations.

The other point raised by the Organization is couched as follows in the General Chairman's December 4, 2006 letter: "The Award is silent with respect to the application of that doctrine [backpay offset by outside earnings] to the balance of the remedy." At the March 10, 2008 Hearing, however, the Organization did not identify

what it meant by the "balance of the remedy" and presented no evidence on that aspect of its request. Any such latent ambiguity in Award 26368 of which we have not yet been made aware, is more than likely addressed in Arbitrator Benn's thorough treatment of the subject in Interpretation No. 1 to First Division Award 25971, which we adopted, endorsed and incorporated by reference in our Award 26368 and which we quote again verbatim herein for ease of reference:

"NATIONAL RAILROAD ADJUSTMENT BOARD
FIRST DIVISION

INTERPRETATION NO. 1 TO AWARD NO. 25971

DOCKET NO. 45876

NAME OF ORGANIZATION: (Brotherhood of Locomotive Engineers

NAME OF CARRIER: (BNSF Railway Company

On March 10, 2004, this Board issued the Award in this case, sustaining the claim and formulating the following remedy:

'... As a remedy, the Claimant shall be reinstated to his former position without loss of seniority or other rights and benefits, made whole in all respects and his record cleared of the charged disciplinary action.'

The dispute in this matter is over the meaning of 'made whole.' The Carrier offset outside earnings received by the Claimant from the time of his dismissal until his reinstatement. The Organization contends that the Carrier could not do so.

There are really two questions before this Board: (1) whether the Carrier can offset from the backpay owed the Claimant the outside earnings received by the Claimant from the time of his dismissal until his reinstatement?; and (2) if the Carrier can offset outside earnings, whether because the Claimant was self-employed after his dismissal, the Carrier must take into account expenses incurred by the Clamant in the operation of his business as a reduction of the amount the Carrier can offset? We find the answers to both questions are 'yes.'

### A. Can The Carrier Offset The Claimant's Outside Earnings?

With citation to authority from this Division (which authority is disputed by the Carrier), the Organization argues in its Submission at 2-3:

> '... While deductions are commonly made in the non-operating crafts, and in other industries, the historical treatment of this issue is different for the operating crafts, and the general custom and usage of the phrase 'pay for time lost' has not included deductions for outside earnings....'

We find, as in similar cases before the other Divisions of this Board, that the Carrier can offset outside earnings earned by the Claimant from the backpay due the Claimant.

First, there is no specific contract provision which <u>prohibits</u> the Carrier from offsetting outside earnings from backpay awards. The point the Organization misses is that absent such prohibitive language (which, if it existed, we would be bound to follow), this Board's authority to formulate remedies is discretionary. See First Division Award 26088 where, after finding the employees were improperly dismissed and sustaining the claim, this Board offset outside earnings in the formulation of a make whole remedy:

> '... [I]n the formulation of remedies, it has long been held that arbitration tribunals have substantial discretion for crafting a

remedy to fit a particular circumstance. See United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 597 (1960):

> When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency.

See also, Local 369 Bakery and Confectionery Workers International Union of America v. Cotton Baking Company, Inc., 514 F.2d 1235, 1237, reh. denied, 520 F.2d 943 (5th Cir. 1975), cert. denied, 423 U.S. 1055 and cases cited therein:

> In view of the variety and novelty of many labor-management disputes, reviewing courts must not unduly restrain an arbitrator's flexibility.

The courts are particularly mindful of deferring to that discretion in decisions made in this industry. Union Pacific Railroad Co. v. Sheehan, 439 U.S. 89, 91, 94 [citations omitted]:

> ... [T]he scope of judicial review of Adjustment Board decisions is 'among the narrowest know[n] to the law.'

> Congress considered it essential to keep these so called 'minor' disputes within the Adjustment Board and out of the courts.'

Second, it has long been held that where a contract violation has been shown, the purpose of a remedy is to restore the status quo ante and

to make any adversely affected employees whole. See Wicker v. Hoppock,
73 U.S. (6 Wall.) 94, 99 (1867):

> 'The general rule is, that when a wrong has been done, and the
> law gives a remedy, the compensation shall be equal to the
> injury. The latter is the standard by which the former is to be
> measured. The injured party is to be placed, as near as may
> be, in the situation he would have occupied if the wrong had
> not been committed.'

See also, W. C. Nabors Co. v. NLRB, 323 F.2d 686, 690 (5th Cir. 1963) ('...
the 'make whole' concept does not turn on whether the pay was wholly
obligatory or gratuitous, but on the restoration of the status quo ante.').

It was with that 'make whole... restoration of the status quo ante'
approach in mind that we noted in First Division Award 26088:

> '... [A] function of a remedy is to make an adversely affected
> employee whole. A remedy is not meant to reward the
> employee or make the employee rich.'

The result argued for by the Organization is that an employee
could be dismissed, earn substantial outside earnings after the dismissal,
and then be reinstated by this Board and allowed to receive full lost
backpay from the Carrier in addition to the substantial outside earnings.
That is a windfall for the employee and is directly contrary to the function
of a remedy which seeks to restore the status quo ante and make the
adversely employee whole. This Board has the discretion to not allow that
result to occur.

Third, we can look to other sources as a guide in determining how
to treat this issue. While not binding upon this Board, the National Labor
Relations Board approaches backpay awards in the same manner argued
for by the Carrier and found appropriate in First Division Award 26088
— i.e., to allow the Carrier to offset the Claimant's outside earnings. See

NLRB Casehandling Manual, Part Three -- Compliance Proceedings [emphasis added]:

10530  Backpay

\*      \*      \*

10530.1 ...

The goal in determining backpay is the same in all cases. The Act is remedial; when it has been violated, its intent is to restore the situation to that which would have taken place had the violation not occurred. Backpay awards are to make whole the person who has suffered from a violation for earnings and other compensation lost as a result of that violation. Backpay awards do not include punitive damages nor do they include compensation for collateral losses, such as from stress or credit problems. The backpay award should leave the discriminatee compensated as though the unlawful action had not occurred.

\*      \*      \*

Backpay is based first on the earnings a discriminatee would have had but for the unlawful action. <u>Against this gross amount is offset the discriminatee's actual earnings from other employment that took place after the unlawful action</u> ....

\*      \*      \*

10550  Net Backpay

10550.1 ...

The final calculation of net backpay is simply all gross backpay <u>minus all offsets from interim employment</u> within the backpay period.'

Fourth, in this case and given the facts presented, we choose to exercise our discretion to not allow the Claimant to be the beneficiary of a potential windfall.

Fifth, we are cognizant of a line of authority cited by the Organization that '...this issue is different for the operating crafts....' But the bright line of precedent the Organization seeks to paint does not exist. The Carrier has cited us to awards of this Division and boards involving the operating crafts where outside earnings <u>have</u> been offset from backpay awards. See PLB No. 3491, Interpretation to Award No. 1:

> 'The matter of deduction of outside earnings is one of the most disputatious issues in this industry. It stems from the fact that this Organization [the UTU] has refused to concede that the common law rule of damages has general applicability to situations where employees are reinstated under contracts that provide for payment for all time lost. The Organization maintains that such provision must be literally applied, and that even if the affected employee lost little or no compensation as a result of being unjustly disciplined. The prevailing legal concept that the employee should be whole but not unjustly enriched, has not been accepted by the Organization. The record is clear that in the early days of the First Division, the Organization's view predominated.'

*　　*　　*

We find that the former older awards are not persuasive or binding since they are not in conformance to the current holdings of federal courts regarding damages, and that the terms "all time lost" must acknowledge and give credit to outside earnings, if any, that Claimant received during the period that he was out of service.

See also, Interpretation No. 1 to First Division Award 24718:

In sustaining this claim for '...all earnings lost as a result of the
unjustified discipline....' it is the intent of this Board that the
Claimant be 'made whole,' i.e., that so far as possible Carrier
must restore him to the status and position he would have been
in but for the violation of his rights under the Agreement. It is
our intent that he be compensated monetarily in an amount
neither less not [sic] more than the earnings he would have
made if he had been retained in the Carrier's service during
the period he was wrongfully discharged. Perforce, and in
accordance with the well-established precedent and principles,
this means offsetting his outside earnings, if any, during the
period in question....'

Further, see First Division Awards 25932 ('Backpay will be subject
to all appropriate offsets, including unemployment compensation he
received and any earnings he may have had from other employment
during the period of his dismissal'); Interpretation No. 1 to Award No.
25309 ('...the Carrier has a right to use outside earnings to offset any
money that might be due...[a]n employee should not rewarded with a
windfall as a result of the Award'); 24156 ('The Claim must be sustained
compensating the Claimant for all time lost, subject to deductions of
outside earnings'); 15765 ('His earnings so made are deductible from the
amount he would have made but for the breach in determining the
amount of damages he is entitled to receive from the party committing the
breach of contract.'). Additionally, see PLB No. 6681, Award No. 2; PLB
No. 6192, Award Nos. 7, 34; PLB No. 5760, Award No. 41; PLB No. 5726,
Award No. 9; PLB No. 4901, Award Nos. 127, 207.

As part of the make whole remedy fashioned in this case, the
Carrier shall therefore be allowed to offset Claimant's outside earnings
from the time of his dismissal until the time of his reinstatement.

### B. Must The Carrier Reduce The Amount Of Outside Earnings It Can Offset By The Amount Of Expenses Incurred By The Claimant's Self-Employment?

The record shows that during the period after his dismissal until his reinstatement, the Claimant was self-employed. The Carrier offset the income the Claimant received, but did not reduce that amount by the expenses the Claimant incurred from his self-employment.

First, in order to make the Claimant whole, if the Carrier is going to offset income from the Claimant's self-employment, then it must also reduce that amount by expenses the Claimant incurred as a result of his self-employment. Again, the purpose of a remedy is to restore the status quo ante. To not require the Carrier to factor in the Claimant's expenses would not restore the status quo ante.

Second (as a guide) this Board can again look to how the National Labor Relations Board treats these issues. See NLRB Casehandling Manual, Part Three -- Compliance Proceedings, supra:

'10541.3 Self-Employment: ...
Net earnings from self-employment during the backpay period should be offset against gross backpay.
...In general, net earnings are the difference between gross receipts and offsetting expenses.'

The amount the Carrier should be able to offset from self-employment is only the *net* earnings the Claimant realized from his self-employment — i.e., gross receipts less expenses. To the extent that the Claimant may have operated his self-employment venture at increased levels as a result of his being dismissed, the only portion of the amounts that are subject to offset by the Carrier are those receipts less expenses which the Claimant received or spent as a result of that increased time spent in his self-employment.

The Claimant shall be 'made whole' consistent with the terms of this Interpretation. The Carrier is entitled to offset outside earnings against the gross backpay owed the Claimant from the time he was dismissed until he was reinstated. The Carrier can also reduce the

Claimant's backpay entitlement by amounts the Claimant earned through self-employment, but those amounts must only be the Claimant's net earnings from his self-employment (i.e., gross receipts less expenses) and then only for the increased time, if any, that the Claimant spent in self-employment as a result of his dismissal."

Referee Dana Edward Eischen, who sat with the Division as a neutral member when Award 26368 was adopted, also participated with the Division in making this Interpretation.

NATIONAL RAILROAD ADJUSTMENT BOARD
By Order of First Division

Dated at Chicago, Illinois, this 29th day of December 2009.

Form 1          NATIONAL RAILROAD ADJUSTMENT BOARD
                         FIRST DIVISION

                                        Award No. 26368
                                        Docket No. 46152
                                        06-1-05-1-19

The First Division consisted of the regular members and in addition Referee
Dana E. Eischen when award was rendered.

                    (Brotherhood of Locomotive Engineers
PARTIES TO DISPUTE:  (
                    (BNSF Railway Company

STATEMENT OF CLAIM:

> "It is hereby requested that Engineer B. D. Broeker's discipline be
> reversed with seniority unimpaired, requesting pay for all time lost
> including the day(s) for investigation with restoration of full benefits
> and that notation of dismissal be removed from his personal record.

FINDINGS:

The First Division of the Adjustment Board, upon the whole record and all the
evidence, finds that:

The carrier or carriers and the employee or employees involved in this dispute
are respectively carrier and employee within the meaning of the Railway Labor Act,
as approved June 21, 1934.

This Division of the Adjustment Board has jurisdiction over the dispute
involved herein.

Parties to said dispute were given due notice of hearing thereon.

Following agreed upon adjournments, a formal Investigation was convened
on June 26, 2003, "for the purpose of ascertaining the facts and determining your
responsibility, if any, in connection with your alleged missed call for train I-
CEILIM113A, on duty at 0430 hours on June 13, 2003, at Centralia, Illinois." By
Notice of Discipline dated July 9, 2003, Carrier found the Claimant culpable as
charged and terminated his employment, based upon a finding that he was culpable

of violating Rule 1.16 on June 13, 2003 and his prior discipline record which, at that time showed more than seven (7) time and attendance violations in the preceding year. We find that Carrier made out a *prima facie* case that the Claimant violated the cited rule on June 13, 2003, and the Claimant provided no persuasive evidence to support any affirmative defense. Therefore, we find no reason to disturb the Carrier's decision to impose appropriate discipline for the rule violation proven in this particular case. However, the penalty assessed by Carrier for the June 13, 2003 missed call must be reduced from a dismissal to 30-day overhead suspension.

This adjustment is required under the Carrier's progressive discipline system because the escalating discipline previously imposed against this Claimant by Carrier in a series of lay-off on call cases was voided by decisions of this Board. [*See* Docket No. 46146, NRAB Case No. 05-1-13; Docket 46147, NRAB Case No. 05-1-14; Docket 46148, NRAB Case No. 05-1-15; and, First Division Award 26365. As a consequence, the discipline imposed in First Division Award 26366 for a June 16, 2002 missed call was reduced to a 10-day overhead suspension and the discipline imposed in First Division Award 26367 for an August 8, 2002 missed call was reduced to a 20-day overhead suspension; thus necessitating the adjustment from dismissal to 30-day overhead suspension in the present case.

Based upon all of the foregoing, this Board concludes that the Claimant must be reinstated to his former position without loss of seniority or other rights and benefits, made whole in all respects and his record adjusted to show a 30-day "overhead" suspension rather than a dismissal. The reinstatement of this Claimant to employment once again brings to the surface an apparently never-ending dispute between these Parties concerning whether the Carrier is entitled to offset against a reinstated employee's monetary damages those monies earned from other sources of employment during the period of wrongful dismissal. Each of the Parties thoroughly briefed that issue and provided prior countervailing decisions for our consideration in this case. After exhaustive analysis and careful consideration of all of these antecedent decisions concerning the deduction of outside earnings in computing "make-whole" damages, especially those involving these same Parties, we endorse and adopt as dispositive of that issue in this case the thoughtful analysis and persuasive reasoning of Arbitrator Edward H. Benn in Interpretation No. 1 of First Division Award 25971.

Claim denied in part and sustained in part as indicated in the opinion.

## AWARD

Claim sustained in accordance with the Findings.

## ORDER

This Board, after consideration of the dispute identified above, hereby orders that an award favorable to the Claimant(s) be made. The Carrier is ordered to make the Award effective on or before 30 days following the postmark date the Award is transmitted to the parties.

NATIONAL RAILROAD ADJUSTMENT BOARD
By Order of First Division

Dated at Chicago, Illinois, this 2nd day of November 2006.

# NATIONAL RAILROAD ADJUSTMENT BOARD
## FIRST DIVISION

## INTERPRETATION NO. 1 TO AWARD NO. 26368

### LABOR MEMBERS' DISSENTING OPINION

**Award No. 26368        Docket No. 46152**
**Referee Dana Edward Eischen**

With all due respect to the findings of the Majority, the Organization's Request for Interpretation was proper and justified. It was the Majority who created the ambiguity in the findings of Award 26368 by citing to a "never-ending dispute between these Parties" regarding the Carrier's demand to offset outside earnings from the Claimant's backpay. Moreover, the Majority created further ambiguity when they pointed to a body of "prior countervailing decisions" considered by the Board. The instant case was the first occasion the Board has had to consider the issue of offsets in a dispute between these Parties, and the Carrier did not present any countervailing decisions. The Organization's Request did comply with the Board's firmly established principle that the proper objective of an Interpretation is to clarify provisions of an Award which might be ambiguous.

Furthermore, we believe the Majority has erroneously applied common law doctrine to this railroad discipline case by allowing the Carrier to offset Claimant's outside earnings, during the time he was wrongfully suspended from service. We respectfully submit that the offset issue was a matter of equity between these parties and that when the Board granted the Carrier the right to offset outside earnings, it altered the parties' agreement by creating a provision that did not previously exist.

The governing rule is plain and unambiguous. The Memorandum of Agreement between the Burlington Northern (former CB&Q) and the United Transportation Union (UTU) sets forth, "when an employee involved in a formal hearing is not assessed discipline, the employee shall be compensated for all time lost." (Emphasis added).

Moreover, the record is completely devoid of any evidence that there is a practice to deduct the outside earnings from a claimant's backpay on the former Burlington Northern (CB&Q). To support their erroneous conclusion to allow offsets, the Majority cites to Interpretation No. 1 to First Division Award 25971, a discipline case arising under a different agreement with a different labor organization, on a completely different property, the former Atchison, Topeka & Santa Fe (AT&SF) Railway Co.

We recognize that arbitrators have wide discretion to fashion remedies, but the U.S. Supreme Court in *Steelworkers v. Enterprise Wheel & Car Corporation*, held that the arbitrator's award "is legitimate only so long as it draws its essence from the collective bargaining agreement." Additionally, custom and practice are as integral to the agreement as the written rules. A properly fashioned remedy must conform to the remedial requirements of the specific agreement, and be consistent with the particular parties' practices. The remedy formulated in the instant dispute did neither.

The Burlington Northern - UTU agreement rule is not a make-whole rule and is completely silent to offsets or other common law mitigations. If the parties had intended to allow offsets, they would have written the deductions into the rule. If the Carrier wants the benefit of applying common law to backpay awards, it must bargain for the right to do so.

The 1967 Carrier Section Six Notice served on the Operating Craft Employees pursuant to Section 156 of the Railway Labor Act, sought the relief provided in the application of common law to backpay awards. First, it is axiomatic that a party does not ask for something it already enjoys. Secondly, the Carriers ultimately failed to achieve an agreement that would allow them to deduct outside earnings. Third, the Agreement's silence regarding this issue is additional evidence of the foregoing, and the Majority's spurious theory that it somehow buttresses the Carrier's right to an offset is not supported by any of the canons of construction.

We are cognizant that the application of common law mitigations is a common and accepted practice in arbitration under the National Labor Relations Act, and for some non-operating crafts under the Railway Labor Act. But such is not always the case with backpay remedies fashioned for operating craft discipline disputes. Unless the agreement expressly allows for deductions, it has overwhelmingly been the practice in the railroad industry not to permit them.

The Majority's conclusion to allow offsets in this dispute ignores the facts that the rule provides for no deductions, and the practice to offset outside earnings has not been heretofore permitted on the former Burlington Northern territory. With respect to the remedy allowing deduction of outside earnings, that portion of the award is palpably erroneous because it does not draw its essence from the agreement and serves as an example of an arbitrator dispensing his "own brand of industrial justice." We respectfully dissent.

*Marcus J. Ruef*
Marcus J. Ruef, Labor Member

*Douglas W. Davidson*
Douglas W. Davidson, Labor Member

# Tab 6-2

National Railroad Adjustment Board, Third Division – Interpretation No. 1 to Award No. 39556

# NATIONAL RAILROAD ADJUSTMENT BOARD
## THIRD DIVISION

## INTERPRETATION NO. 1 TO AWARD NO. 39556

### DOCKET NO. MW-40421

**NAME OF ORGANIZATION:** (Brotherhood of Maintenance of Way Employes
( Division - IBT Rail Conference

**NAME OF CARRIER:** (BNSF Railway Company  (former Burlington
( Northern Railroad Company)

     This matter has been returned to the Board on the request of the Organization for an Interpretation. In Award 39556, issued February 27, 2009, we sustained the claim and stated that the Claimant was entitled to the remedy prescribed by the parties in Rule 40G.

     The Carrier contends that the award of backpay should be offset with outside earnings during the period that the Claimant was off work. It asserts that the language of the Agreement, the inherent right of management, as well as on-property precedent of awarding "make whole" remedies for reinstated employees, allows for such deductions. The Organization counters that the Carrier waived offset of backpay because it was not raised during the handling of the claim on the property and even if raised, there is no Agreement provision under Rule 40G that allows for the deduction of outside earnings from an award of backpay. Further, according to the Organization, the Awards cited by the Carrier did not interpret the instant Agreement.

     The Carrier argues that the Claimant is not entitled to a windfall or double recovery that he would receive if there were no offset. The Organization replies that if the Carrier's analysis is adopted, then monetary loss and damages resulting from an improper dismissal should be part of the computation. Further, if income was from a part-time job that the Claimant had prior to his dismissal, that income should not be considered.

     The Carrier cites Awards for the proposition that the Claimant should be made whole for the period he was off work prior to his reinstatement.

Page 2

Serial No. 410
Interpretation No. 1 to
Award No. 39556
Docket Nos. MW-40421
NRAB-00003-080244

The Organization argues that a make-whole award is improper because the Agreement is clear that a reinstated employee is to be paid for time lost – with no mention of offset for outside earnings.

The Carrier cites to the decision in First Division Award 25971, Interpretation 1 as res judicata on the instant Interpretation. After reviewing the record, Submissions, and arguments in the instant matter, the Board agrees with the Carrier. Interpretation 1 to Award 25971 provides a lengthy discussion of the issue of offset in backpay Awards and the pertinent portion is cited below.

"... The Carrier offset outside earnings received by the Claimant from the time of his dismissal until his reinstatement. The Organization contends that the Carrier could not do so.

There are really two questions before this Board: (1) whether the Carrier can offset from the backpay owed the Claimant the outside earnings received by the Claimant from the time of his dismissal until his reinstatement?; and (2) if the Carrier can offset outside earnings, whether because the Claimant was self-employed after his dismissal, the Carrier must take into account expenses incurred by the Clamant in the operation of his business as a reduction of the amount the Carrier can offset? We find the answers to both questions are 'yes.'

A. Can The Carrier Offset The Claimants Outside Earnings?

With citation to authority from this Division (which authority is disputed by the Carrier), the Organization argues in its Submission at 2-3:

'... While deductions are commonly made in the non-operating crafts, and in other industries, the historical treatment of this issue is different for the operating crafts, and the general custom and usage of the phrase "pay for time lost" has not included deductions for outside earnings. ...'

Page 3

Serial No. 410
Interpretation No. 1 to
Award No. 39556
Docket Nos. MW-40421
NRAB-00003-080244

We find, as in similar cases before the other Divisions of this Board, that the Carrier can offset outside earnings earned by the Claimant from the backpay due the Claimant.

First, there is no specific contract provision which **prohibits** the Carrier from offsetting outside earnings from backpay awards. The point the Organization misses is that absent such prohibitive language (which, if it existed, we would be bound to follow), this Board's authority to formulate remedies is discretionary. See First Division Award 26088 where, after finding the employees were improperly dismissed and sustaining the claim, this Board offset outside earnings in the formulation of a make whole remedy:

> '. . . [I]n the formulation of remedies, it has long been held that arbitration tribunals have substantial discretion for crafting a remedy to fit a particular circumstance.' See United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 597 (1960):
>
> > When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency.

See also, Local 369 Bakery and Confectionery Workers International Union of America v. Cotton Baking Company, Inc., 514 F.2d 1235, 1237, reh. denied, 520 F.2d 943 (5th Cir. 1975), cert. denied, 423 U.S. 1055 and cases cited therein:

> In view of the variety and novelty of many labor-management disputes, reviewing courts must not unduly restrain an arbitrator's flexibility.

Page 4

Serial No. 410
Interpretation No. 1 to
Award No. 39556
Docket Nos. MW-40421
NRAB-00003-080244

The courts are particularly mindful of deferring to that
discretion in decisions made in this industry. Union Pacific
Railroad Co. v. Sheehan, 439 U.S. 89, 91, 94 [citations
omitted]:

. . . [T]he scope of judicial review of Adjustment Board
decisions is 'among the narrowest know[n] to the law.'

Congress considered it essential to keep these so called
'minor' disputes within the Adjustment Board and out of the
courts.'

Second, it has long been held that where a contract violation has
been shown, the purpose of a remedy is to restore the status quo ante
and to make any adversely affected employees whole. See Wicker v.
Hoppock, 73 U.S. (6 Wall.) 94, 99 (1867):

'The general rule is, that when a wrong has been done, and
the law gives a remedy, the compensation shall be equal to
the injury. The latter is the standard by which the former is
to be measured. The injured party is to be placed, as near as
may be, in the situation he would have occupied if the wrong
had not been committed.'

See also, W. C. Nabors Co. v. NLRB, 323 F.2d 686, 690 (5th Cir.
1963) ('. . . the "make whole" concept does not turn on whether the
pay was wholly obligatory or gratuitous, but on the restoration of
the status quo ante.').

It was with that 'make whole . . . restoration of the status quo ante'
approach in mind that we noted in First Division Award 26088":

'. . . [A] function of a remedy is to make an adversely
affected employee whole. A remedy is not meant to reward
the employee or make the employee rich.'

Page 5

Serial No. 410
Interpretation No. 1 to
Award No. 39556
Docket Nos. MW-40421
NRAB-00003-080244

The result argued for by the Organization is that an employee could be dismissed, earn substantial outside earnings after the dismissal, and then be reinstated by this Board and allowed to receive full lost backpay from the Carrier in addition to the substantial outside earnings. That is a windfall for the employee and is directly contrary to the function of a remedy which seeks to restore the status quo ante and make the adversely [affected] employee whole. This Board has the discretion to not allow that result to occur.

Third, we can look to other sources as a guide in determining how to treat this issue. While not binding upon this Board, the National Labor Relations Board approaches backpay awards in the same manner argued for by the Carrier and found appropriate in First Division Award 26088 - i.e., to allow the Carrier to offset the Claimant's outside earnings. See NLRB Casehandling Manual, Part Three - - Compliance Proceedings [emphasis added]:

'10530 Backpay

\*     \*     \*

10530.1 . . .

The goal in determining backpay is the same in all cases. The Act is remedial; when it has been violated, its intent is to restore the situation to that which would have taken place had the violation not occurred. Backpay awards are to make whole the person who has suffered from a violation for earnings and other compensation lost as a result of that violation. Backpay awards do not include punitive damages nor do they include compensation for collateral losses, such as from stress or credit problems. The backpay award should leave the discriminatee compensated as though the unlawful action had not occurred.

\*     \*     \*

Page 6

Serial No. 410
Interpretation No. 1 to
Award No. 39556
Docket Nos. MW-40421
NRAB-00003-080244

Backpay is based first on the earnings a discriminatee would have had but for the unlawful action. <u>Against this gross amount is offset the discriminatee's actual earnings from other employment that took place after the unlawful action.</u> . . .

\     *     *     *

10550 Net Backpay

10550.1 . . .

The final calculation of net backpay is simply all gross backpay <u>minus all offsets from interim employment</u> within the backpay period.'

Fourth, in this case and given the facts presented, we choose to exercise our discretion to not allow the Claimant to be the beneficiary of a potential windfall.

Fifth, we are cognizant of a line of authority cited by the Organization that '. . . this issue is different for the operating crafts. . . .' But the bright line of precedent the Organization seeks to paint does not exist. The Carrier has cited us to awards of this Division and boards involving the operating crafts where outside earnings <u>have</u> been offset from backpay awards. See PLB No. 3491, Interpretation to Award No. 1:

'The matter of deduction of outside earnings is one of the most disputatious issues in this industry. It stems from the fact that this Organization [the UTU] has refused to concede that the common law rule of damages has general applicability to situations where employees are reinstated under contracts that provide for payment for all time lost. The Organization maintains that such provision must be literally applied, and that even if the affected employee lost little or no compensation as a result of being unjustly

Page 7

Serial No. 410
Interpretation No. 1 to
Award No. 39556
Docket Nos. MW-40421
NRAB-00003-080244

disciplined. The prevailing legal concept that the employee should be whole but not unjustly enriched, has not been accepted by the Organization. The record is clear that in the early days of the First Division, the Organizations view predominated.

* * *

We find that the former older awards are not persuasive or binding since they are not in conformance to the current holdings of federal courts regarding damages, and that the terms "all time lost" must acknowledge and give credit to outside earnings, if any, that Claimant received during the period that he was out of service.'

See also, Interpretation No. 1 to First Division Award 24718:

'In sustaining this claim for ". . . all earnings lost as a result of the unjustified discipline . . . ." it is the intent of this Board that the Claimant be "made whole," i.e., that so far as possible Carrier must restore him to the status and position he would have been in but for the violation of his rights under the Agreement. It is our intent that he be compensated monetarily in an amount neither less not [sic] more than the earnings he would have made if he had been retained in the Carriers service during the period he was wrongfully discharged. Perforce, and in accordance with the well-established precedent and principles, this means offsetting his outside earnings, if any, during the period in question. . . .'

Further, see First Division Awards 25932 ('Backpay will be subject to all appropriate offsets, including unemployment compensation he received and any earnings he may have had from other employment during the period of his dismissal'); Interpretation No. 1 to Award No. 25309 ('. . . the Carrier has a right to use outside earnings to offset any money that might be due . . . [a]n employee should not

Page 8

Serial No. 410
Interpretation No. 1 to
Award No. 39556
Docket Nos. MW-40421
NRAB-00003-080244

[be] rewarded with a windfall as a result of the Award'); 24156 ('The Claim must be sustained compensating the Claimant for all time lost, subject to deductions of outside earnings');15765 ('His earnings so made are deductible from the amount he would have made but for the breach in determining the amount of damages he is entitled to receive from the party committing the breach of contract.'). Additionally, see PLB No. 6681, Award No. 2; PLB No. 6192, Award Nos. 7, 34; PLB No. 5760, Award No. 41; PLB No. 5726, Award No. 9; PLB No. 4901, Award Nos. 127, 207.

As part of the make whole remedy fashioned in this case, the Carrier shall therefore be allowed to offset Claimant's outside earnings from the time of his dismissal until the time of his reinstatement."

The above discussion is dispositive. The Carrier can deduct outside earnings from the backpay of the Claimant in the instant matter.

The second issue of whether the Carrier had made the required health and welfare payments for the Claimant was also discussed at the Interpretation Hearing. The parties agreed that the matter could be readily resolved by a copy of the receipt indicating that the required payment had been made. The Carrier is ordered to forward a copy of that receipt to the Organization.

Accordingly, the Claimant shall be made whole consistent with the terms of this Interpretation. The Carrier is entitled to offset outside earnings against the gross backpay owed the Claimant from the time he was dismissed until he was reinstated.

Referee Brian Clauss who sat with the Division as a neutral member when Award 39556 was adopted, also participated with the Division in making this Interpretation.

NATIONAL RAILROAD ADJUSTMENT BOARD
By Order of Third Division

Dated at Chicago, Illinois, this 29th day of November 2012.

LABOR MEMBER'S DISSENT
TO
INTERPRETATION NO. 1 TO THIRD DIVISION AWARD 39556,
NRAB DOCKET NO. MW-40421
(Referee Clauss)


      Interpretation No. 1 to Third Division Award 39556 ignores the longstanding rules of the Board prohibiting either party from raising arguments and/or introducing evidence at the Board if such arguments and evidence have not been raised during the handling of the dispute on the property. The principle that such new argument and/or evidence is to be rejected by the Board is so well settled as to preclude the necessity of citation of supporting precedent. Had the Majority properly rejected the new arguments raised by the Carrier, it would have saved itself from compounding its error by deciding the new issue by totally ignoring the precedent decisions of this Division under the rules of the applicable Agreement and its and predecessor Agreements and, instead, importing the reasoning in an interpretation from another Division of this Board that interpreted a different collective bargaining agreement.

      The Organization Member wholeheartedly concurs with the Referee's <u>initial</u> finding that the Carrier violated the Agreement in this case when it dismissed the Claimant and, in part, still does insofar as his return to service is concerned. The Board properly held the Claimant must be reinstated and be paid for all time lost. As soon as the award was adopted, the Organization attempted to have the Claimant compensated in accordance with the clear terms of the award. However, rather than to comply with the Order of the Division, this Carrier raised a new contention that was never discussed by the parties during the handling of this dispute on the property. That contention was that the Claimant was to provide documentation to show what he had earned in the interim period from the time he was improperly dismissed until he was reinstated to service. The Carrier had more than one (1) year after his dismissal to raise that argument within the on-property correspondence, but chose to stand mute on the subject, but waited to spring the requirement on the Claimant just as he was preparing to return to work.

      Clearly the Majority grievously erred when it failed to reject the Carrier's position based on its untimeliness. However, even if the merits of the Carrier's position could have been reached, the Majority erred when it failed to take into consideration the precedent under this and predecessor Agreements. This is true for several reasons. First, it is obvious that the Carrier's improper argument on remedy, centered on the issue of the deduction of outside earnings from any award of monetary damages, constitutes a naked attempt to mitigate its liability on the basis of common law concepts of equity. However, the awards establishing the principle that common law issues of equity are not properly before this Board are legion. Typical of such precedent are Third Division Awards 9437 and 11446.

      Rather than to have adopted the common law rule of "make whole" relief, within the Agreement, the parties have agreed on the remedy for employes who are found to have been

unjustly disciplined or dismissed from their employment with the Carrier. Such remedy is specifically provided under Rule 40G of the Agreement, which reads:

> "G. If it is found that an employe has been unjustly disciplined or dismissed, such discipline shall be set aside and removed from record. He shall be reinstated with his seniority rights unimpaired, and be compensated for wage loss, if any, suffered by him, resulting from such discipline or suspension."

Inasmuch as the Agreement governs the employment relationship between the Carrier and its employes and not that of any outside party, it is clear that the wages lost by a claimant as a result of the improper discipline or dismissal include all the wages the Claimant would have received from the Carrier absent the imposition of unjust discipline. In some cases, such as with the issuance of a written reprimand or a "record suspension", the employe may suffer no wage loss as a result of the disciplinary action and no monetary remedy would be required. In the case of an unjust suspension or dismissal, a monetary remedy is required. Whether or not a claimant receives other income during that period is irrelevant in determining the wages lost by the employe as a result of the unjust discipline or dismissal. The determination of these questions does not depend on factors or evidence outside the property. In fact, the Carrier and its predecessors have, in the past, recognized that no authority to deduct from that payment of full back pay can be found in the language of the Agreement.

## Historical Background

On December 7, 1945, the NRAB Third Division adopted Award 3011, between the Brotherhood of Railway and Steamship Clerks and the Chicago, Burlington and Quincy RR (CB&Q), a predecessor of the Burlington Northern and of BNSF as it exists today. In Award 3011, the Board sustained the claim for the employe's reinstatement and pay for all time lost due to her unjust dismissal. After the award was rendered, the Carrier returned to the Board to request an interpretation, seeking to deduct the Claimant's outside earnings from the damages owed under the terms of the award. That action clearly indicates that the Carrier recognized that under the rules of the Agreement controlling in that dispute, the clear language of the award did not allow a deduction for outside earnings and that it came to the Board in that instance requesting an interpretation that would allow it to make such deduction. In its Interpretation, the Board found, in pertinent part:

> "This controversy, therefore, resolves itself into the rather narrow issue as to the meaning of Rule 52, which we here quote in its entirety:

> "'If the final decision decrees that charges against the employe were
> not sustained, the record shall be cleared of the charge; if dismissed,
> the employe shall be reinstated and compensated for wage loss (if
> any) suffered by him.'

Stated another way, the question is whether Rule 52 is merely declaratory of the
common law rule, or whether it establishes a more liberal formula for measuring
the claimant's compensation rights.

\* \* \*

Inasmuch as Rule 52 expressly embraces only a part of the common law rule,
entitling the claimant to what she would have earned had she been allowed to
work, without embodying therein, also, the correlative right of the carrier to deduct
other earnings, we must conclude that it was not the intent of the parties to apply
the common law doctrine in cases such as this.

\* \* \*

It is our conclusion, therefore, that a proper construction of Award 3011 precludes
the application urged on behalf of the carrier."

Interpretation No. 1 to Third Division Award 3011, dated November 21, 1946, is relevant
to the application of Rule 40G of the current BN/BMWE Agreement because the language of the
rules are virtually identical, having their origins in the predecessor agreements on the CB&Q.
Inasmuch as the Board has interpreted the language of the rule and the parties have not negotiated
any substantive change to that rule, the rule must mean the same as it did when the Board did rule
on its correct interpretation. Consequently, the proper interpretation of Rule 40G does not embody
any right of the Carrier to make any deduction for outside earnings.

After Award 3011 was issued, but before the Division had adopted its Interpretation No. 1
thereto, on February 1, 1946, the Third Division adopted Award 3113, between BMWE and
CB&Q. Following the issuance of that award, the Carrier returned to the Board and asked that
said award be interpreted in such a way as to allow it to deduct the outside earnings of the
claimant therein when making the ordered payment for lost wages. That action clearly indicates
that the Carrier recognized that under the Agreement then in effect, the clear language of the award
did not allow a deduction for outside earnings and that it came to the Board in that instance
requesting an interpretation that would allow it to make such deduction. The Board, however,
declined to do so. Rather, the Board held that the Carrier's attempt to have the issue of deduction
of outside earnings considered after the Board had rendered its award was improper because the
issue was not properly raised by the Carrier when the Board originally considered the claim. Of

course, had the Carrier attempted to raise such issue for the first time in its submission or presentation to the Board, it would have been improper inasmuch as it had not been raised during the handling of the dispute on the property and was barred from consideration. Moreover, in view of the contemporaneous Interpretation No. 1 to Award 3011, it was already clear that the Board viewed the quoted language of the Agreement as to preclude any deduction for outside earnings.

There can be no question but that in Interpretation No. 1 to Award 3113, the Carrier's attempt to argue this new issue was seen as an attempt to have the Board modify its award so as to reduce the amount of monetary damages the claimant therein would receive and that without such modification, the Carrier was required to pay the full measure of the wages he would have received from the Carrier had he not been unjustly suspended, with no deduction for outside earnings. The same principles hold true to this day.

In December of 1970, CB&Q, Northern Pacific (NP), Great Northern (GN) and Spokane, Portland and Seattle (SP&S) merged to form the Burlington Northern Railroad. Following the merger, BMWE and the Carrier negotiated a new system-wide Agreement to replace the separate agreements that had been in effect on each of the predecessor carriers. That consolidated Agreement became effective May 1, 1971. Rule 69C thereof explicitly preserved the rights accruing to employes covered by the Agreements that had been in effect. Rule 69C of the May 1, 1971 Agreement reads:

"C. It is the intent of this Agreement to preserve pre-existing rights accruing to employes covered by the Agreements as they existed under similar rules in effect on the CB&Q, NP, GN and SP&S Railroads prior to the date of merger; and shall not operate to extend jurisdiction or Scope Rule coverage to agreements between another organization and one or more of the merging Companies which were in effect prior to the date of merger."

In view of Interpretation No. 1 to Third Division Award 3011 and Interpretation No. 1 to Third Division Award 3113, Rule 69C of the May 1, 1971 Agreement explicitly operated to preserve the contractual right of Maintenance of Way employes, if it is found that an employe has been unjustly disciplined or dismissed, to have such discipline or employment termination set aside and removed from record, to be reinstated with seniority rights unimpaired and to be compensated for wage loss, if any, suffered by him, resulting from such discipline or suspension, without any deduction for any income he may have earned while unjustly suspended or dismissed when it preserved the "... pre-existing rights accruing to employes covered by the Agreements as they existed under similar rules in effect on the CB&Q, NP, GN and SP&S Railroads prior to the date of merger." Thereafter, when the parties negotiated a new Agreement that became effective

September 1, 1982, Rule 69C was preserved and continued, unchanged but for renumbering as Rule 78C – preserving those same pre-existing rights accruing to the employes.

On April 29, 1998, the Third Division adopted Award 32565 (decided under the September 1, 1982 Agreement) in which it found that BNSF had wrongfully terminated the employment of the claimant therein. In Third Division Award 32565, the Board found that "*** The Claimant shall be put back to work with back pay for all time lost and with seniority unimpaired. ***" The Board thereupon issued an order to make effective Award 32565 and directed Carrier to pay to the employe the sum he was entitled under the award.

Following the issuance of Award 32565, the Carrier returned to the Board and asked that said award be interpreted in such a way as to allow it to deduct the outside earnings of the claimant therein when making the ordered payment for lost wages, just as it had in Award 3113. That action clearly indicates that the Carrier continued to recognize that in light of the clear language of the Agreement and the pre-existing rights accruing to employes covered by the Agreement as it existed under similar rules in effect on the CB&Q prior to the date of the 1970 merger, Award 32565 did not allow a deduction for outside earnings and that it came to the Board in that instance requesting an interpretation that would in essence modify the award and the previous interpretations of the Third Division so as to allow it to make such deduction. The Board, however, declined to overturn its precedent decisions, quoted above. In this connection, in Interpretation No. 1 to Third Division Award 32565, the Board found:

> "In view of the foregoing the Board rules that arguments presented by the Carrier for deducting outside earnings of the Claimant when implementing Third Division Award 32565 are arguments which are not properly before the Board. Specific request for any amendment to Board Award 32565 by the Carrier is, therefore, dismissed.
>
> Claimant Hernandez shall be compensated for all wage loss suffered after his dismissal on June 25, 1996 without deduction of any outside earnings."

Here, the Board again held that the Carrier's attempt to have the issue of deduction of outside earnings considered for the first time at the Board was improper because the issue was not raised by the Carrier during the handling of the dispute on the property. It must also be noted that the Board viewed the Carrier's attempt to argue this new issue was an attempt to have the Board modify or amend its award under the guise of interpretation so as to reduce the amount of damages the claimant therein would receive. Moreover, the Board determined that the clear language of the Agreement required that the claimant be compensated for all wage loss suffered without deduction of any outside earnings.

In 2002, the parties updated the September 1, 1982 Agreement. However, according to its own explicit terms, that Updated Agreement, dated December, 2002, is a synthesis of the parties' existing agreements as of that date and is intended only as a convenient updated reference guide for both the Carrier and the employes and nothing contained or omitted therein is to be construed to amend or nullify all or any part of the existing Agreements between the parties. Within the December, 2002 Agreement synthesis, Rule 78C of the September 1, 1982 Agreement is included therein saved for being renumbered as Rule 80B. Rule 80B reads:

"B.     It is the intent of this Agreement synthesis to preserve pre-existing rights accruing to employes covered by the Agreements as they existed under similar rules in effect on the CB&Q, NP, GN, and SP&S Railroads prior to the date of the 1970 merger; and shall not operate to extend jurisdiction or Scope Rule coverage to agreements between another organization and one or more of the merging Companies which were in effect prior to the date of the 1970 merger."

In view of Interpretation No. 1 to Third Division Award 3011, Interpretation No. 1 to Third Division Award 3113 and Interpretation No. 1 to Third Division Award 32565, it is clear that Rule 78C of the September 1, 1982 Agreement explicitly operated to preserve the contractual right of Maintenance of Way employes, if it is found that an employe has been unjustly disciplined or dismissed, to have such discipline or employment termination set aside and removed from record, to be reinstated with his seniority rights unimpaired and to be compensated for wage loss, if any, suffered by him, resulting from such discipline or suspension, without any deduction for any income he may have earned while unjustly suspended or dismissed when it preserved the "... pre-existing rights accruing to employes covered by the Agreements as they existed under similar rules in effect on the CB&Q, NP, GN and SP&S Railroads prior to the date of the 1970 merger." Clearly, the December, 2002 Agreement synthesis preserved and continued, unchanged but for renumbering as Rule 80B, the same pre-existing right was preserved under the September 1, 1982 Agreement. Moreover, the December 2002 Agreement synthesis, by its very terms, did not serve to amend or nullify all or any part of the existing Agreements between the parties. Consequently, the Claimant has the same right to be compensated for wage loss without deduction for any outside earnings as existed under the CB&Q Agreement prior to 1970 and that right has been explicitly preserved in all subsequent updates and revisions to the Agreement.

For over fifty (50) years after the adoption of the Interpretations to Third Division Awards 3011 and 3113, the record reveals no controversy concerning the implementation of the findings therein. Had the majority considered the historical interpretation and application of the rules of the instant Agreement, perhaps there would have been a well-reasoned interpretation in this case. However, the Majority instead chose to fill its "interpretation" with a lengthy quotation

of an award of a different Division, interpreting a different rule and importing principles that are not to be found within the Agreement and which have specifically been found NOT to apply.

The Board should note that in a dispute wherein the carrier involved did raise the issue of outside earnings deduction during the handling of the dispute on the property, First Division Award 26788 (with the same Referee sitting as the neutral member) interpreted similar Agreement language to that involved here and found that the language of that Agreement did not contemplate a deduction for outside earnings and, therefore, none could be made. In First Division Award 26788, the Board recognized that the interpretation of Collective Bargaining Agreements under the Railway Labor Act are not governed by the same common law concepts as those arising outside of it. Consequently, the common law concept of a "make whole" remedy cannot properly be applied thereto unless such terms have been included in the Agreement by the parties. In this connection, the Board recognized that any earnings offsets would be items for bargaining. Indeed, such items have been the subject of bargaining and some agreements between other carriers and BMWE contain a provision to deduct outside earnings earned during a wrongful suspension or discharge of an employe. The Duluth, Missabe and Iron Range Railway Company and BMWE negotiated Rule 10(g), which reads:

"RULE 10 Discipline

(g) If final decision decrees that the charges against the employee are not sustained or that the offense does not warrant the discipline administered, the employee shall be returned to his former position from which removed, and compensated in the amount he would have earned had there been no suspension or dismissal less any amount earned through any other employment, provided an employee who has earnings from other employment may deduct from those earnings necessary expenses in securing and performing the work."

The Seaboard System Railroad, now a part of the CSX Corporation and BMWE negotiated Rule 39, Section 5, which reads:

"Section 5
If the decision is in favor of the employee, his record shall be cleared of the charge, and if suspended or dismissed, he will be reinstated to his former position with seniority unimpaired and shall be compensated in the amount he would have earned had he continued in the service less the amount earned in other employment."

Finally, the Agreement between BMWED and BNSF governing the former St. Louis-San Francisco (Frisco) provides within Rule 91(b):

> "If the charge against the employe is not sustained, it shall be stricken from the record. If by reason of such unsustained charge the employe has been removed from position held, reinstatement will be made and payment allowed for the assigned working hours actually lost while out of the service of the Carrier at not less than the rate of pay of position formerly held, or for the difference in rate of pay earned if in the service, less any amount earned in other employment."

As will be noted from a comparison of the above-quoted rules with the rule applicable here, when negotiators in the railroad industry intended to provide for the deduction of outside earnings from payments for lost time for employes who are found to have been unjustly suspended or dismissed, those negotiators knew how to write such contract language. In contrast, in Rule 40G of the Agreement controlling in this case, this Carrier and BMWE did not negotiate a remedy which would allow for the deduction of outside earnings during a wrongful suspension or dismissal of any employe. If it had been the intention of the parties to include such a provision, they would have clearly stated such in the rule. They did not do so. The Majority is in total error when it unilaterally rewrites Rule 40G in such a manner when the parties have not mutually agreed to do so. Instead, the Majority is willing to take away an important contractual right that the Organization secured within the Agreement and rightly had relied on for decades. The fact that the Majority is willing to do so without so much as a cursory examination of the historical precedent under this Agreement is indefensible.

In addition to the comments above, it is submitted that the language of Rule 40G, "*** wage loss, if any, suffered by him, resulting from such discipline or suspension." was in part negotiated and intended to protect the Carrier from having to compensate an employee for wages that the employe would not have earned during the period of wrongful suspension or dismissal. For example, assume the instance of an employe who was suspended for six (6) months between the months of December through May of any given year. If said employe would have been furloughed for any period of time during those six (6) months, the Carrier, in the event the discipline was later found to have been unjustified, would calculate the "wage loss suffered" only on the portion of time the wronged employe would have been entitled to work in accordance with his seniority. In the case of a record suspension or probation, there could well be no wage loss suffered at all. Any attempt take the giant leap from applying Rule 40G in the manner described above to also rewrite the terms of the Agreement to insert a provision for the deduction of outside earnings is not supported by logic and reason and would force the Claimant to subsidize the Carrier's unjust imposition of dismissal or suspension.

Notwithstanding the foregoing, it seems the majority in this case wishes to open up the process to issues of equity and the common law of damages. The majority, thus, must be ready to consider all such issues, involving not only the Claimant's lost wages, but also all monetary and other damages suffered by him as a result of his arbitrary and unjust dismissal from service. As held in First Division Award 11670:

> "If a carrier has the right to present to this Board the issue of mitigation of damages, then under the same legal principles an employe should have the right to present issues involving not only his loss of wages, but, in addition, issues relative to such special damages as were sustained by him because of the breach of his employment contract. It would seem that this Board could not properly authorize mitigation of an employe's damages for breach of his employment contract, unless it first has permitted such an employe to establish all his damages, special and general, arising from such breach. But, as hereinbefore indicated, such general issues cannot be determined without the presentation of testimony, subjected to cross-examination; without reference to factors and considerations entirely outside of the property involved and the governing schedules; and without the presence of a fact-finding tribunal to finally determine the same."

The findings of First Division Award 11670 are important here because they recognize that the issues raised by the Carrier's deduction for outside earnings also invite attention to similar issues involving the Claimant's damages and that such issues arise entirely outside of the property involved and outside of the governing agreement. It appears the Carrier would consider the Claimant's outside earnings a "benefit" of his having to suffer through dismissal as a railroad employe and, thus, should be deducted from a back pay award. However, if one were to subscribe to that notion, one would necessarily have to consider the consequential damages suffered by the aggrieved party also. Obviously, a balance could not be had unless both sides of the story were examined. For example, the unjustly suspended or dismissed claimant suffers a loss of contractually provided health, dental and vision care insurance for himself and his family; medical prescription benefits; credited service and compensation under Railroad Retirement; paid time off in the form of paid holidays and vacation; etc. While some of those medical, dental and vision care expenses may be reimbursed upon his reinstatement to service, there may have been other consequential damages as a result of not having been covered at the time those expenses were incurred and/or damages when medical care may have been deferred because of a lack of coverage. How would we find a remedy for a serious illness that could have been prevented had a claimant's medical insurance not lapsed? What monetary damages would be required to compensate the unjustly suspended or dismissed employe for the physical, emotional and other damages suffered by the employe as a result of his being unjustly withheld or fired from his railroad job.

Furthermore, the employe could well see his credit rating damaged, resulting in higher interest payments on mortgage and other loans, higher insurance rates, etc. It would obviously be necessary to compensate the Claimant for those readily foreseeable losses as well, should the issue of compensation for damages be opened up to a full examination of the damages suffered. And, of course, the Claimant would undoubtedly be entitled to receive a fair rate of interest on any back wages he would ultimately receive. Countless other losses could be cited and examined. If the Carrier argues for the application of the common law of damages, it must be prepared for the monetary compensation to be increased, as well.

### It Would Be Unjust To Allow The Carrier To Deduct Outside Earnings Made By The Claimant That He Would Have Earned Absent The Unjust Discipline.

Not only did the Majority ignore the precedent decisions of this Division, it also failed to take into consideration the entire question of the outside earnings the Claimant would have had even if he had never been unjustly dismissed. Clearly it would be patently unjust to deduct the Claimant's outside earnings for any period of time he would have been observing paid time off from the Carrier, such as vacation, personal leave days and recognized holidays, had he not been unjustly dismissed, because that work and those earnings would have been available to him absent the unjust dismissal. Likewise, it would be unjust to allow the Carrier to deduct outside earnings made by the Claimant that he would have earned even if he had not been unjustly dismissed. Countless employes earn outside income through part-time employment, rental income, farming and/or other small business enterprises that they engage in outside of the time devoted to the performance of their railroad employment. The Carrier has no claim on those outside earnings regardless of whether the employe is working, furloughed or unjustly held out of service. The fact that the Carrier unjustly suspended or dismissed an employe does not and cannot operate to confer to the Carrier a claim to those earnings. Moreover, even if the Carrier were justified in deducting outside earnings that an employe could not have made while employed by BNSF (which under this Agreement it plainly cannot), the Carrier would necessarily be required to prove the amount of those outside earnings versus the outside earnings the Claimant could have made in the absence of the unjust dismissal. Inasmuch as the majority failed to address that issue, it must be assumed that the majority's endorsement of a "make whole" remedy would work to protect from the Carrier's reach, the income the Claimant would have made had he not been unjustly dismissed.

The Majority's findings in this instance have effectively created a new award in the guise of an interpretation which numerous awards of the Board has eschewed. In view of the foregoing, it is clear that the Interpretation reached by the Majority is seriously and palpably erroneous. It is improper in that the majority chose to ignore the prohibition on new evidence and argument that

was not raised during the handling on the property. It is devoid of reasoning concerning the historical interpretation and precedent concerning the very contract language involved here. For the reasons detailed above, Interpretation No. 1 to Award 39556 is palpably erroneous and I dissent.

Respectfully submitted,

Gary L. Hart
Labor Member

# Tab 6-3

National Railroad Adjustment Board, First Division –
Award No. 25971

Form 1          NATIONAL RAILROAD ADJUSTMENT BOARD
                          FIRST DIVISION

                                              Award No. 25971
                                              Docket No. 45876
                                              04-1-02-1-B-2187

     The First Division consisted of the regular members and in addition Referee
Edwin H. Benn when award was rendered.

                          (Brotherhood of Locomotive Engineers
PARTIES TO DISPUTE: (
                          (Burlington Northern Santa Fe Railway Company

STATEMENT OF CLAIM:

     "Claim on behalf of Engineer R. B. Wallace for restoration to
     service with pay for all time lost, seniority, vacation, and all other
     benefits unimpaired, in connection with a discipline of dismissal
     assessed July 9, 2001 following the formal investigation conducted
     June 27, 2001."

FINDINGS:

     The First Division of the Adjustment Board, upon the whole record and all the
evidence, finds that:

     The carrier or carriers and the employee or employees involved in this dispute
are respectively carrier and employee within the meaning of the Railway Labor Act,
as approved June 21, 1934.

     This Division of the Adjustment Board has jurisdiction over the dispute
involved herein.

     Parties to said dispute were given due notice of hearing thereon.

     After reporting to work on April 23, 2001, the Claimant, an employee since
September 1968 and an Engineer since 1978, was instructed to take a FRA random
drug/alcohol test. The test showed a positive result for marijuana. The Claimant
had tested positive in February 1993, went through rehabilitation, and was offered a
conditional reinstatement for that first violation. After Investigation held on June

27, 2001, and by letter dated July 9, 2001, the Claimant was dismissed for violation of Rule 1.5 of the General Code of Operating Rules and Section 7.9 of the Carrier's Policy on the Use of Alcohol and Drugs.

The Claimant denies smoking marijuana prior to going on duty on April 23, 2001. The Claimant states, "I went through rehab in 1993, taken many tests since then, and I've been clean for many years . . . I was not using any marijuana."

The Claimant testified how the urine samples were taken. According to the Claimant, he and another employee Castillo were given tests:

> "A   . . . We both went to the third floor on - actually, the second floor, we took our alcohol test, me and Mr. Castillo and Ms. Swan went to the third floor, we urinated into the large vessels, both of us did, promptly, and we went back down to the second floor, set them on the desk, and for a 10 to 15-minute period the two unmarked large vessels remained on the desk while paperwork was filled out.

> \*     \*     \*

> . . . During this 10 or 15 minutes of paperwork, I got up and walked around the room, looking at a picture on the wall, papers lying on tables, and also went into the hallway momentarily. I wasn't told, nor did I know, that my attention should have been solely on my specimen. I believed that the two of us were clean and erroneously saw no cause to be so diligent.

> After Ms. Swan completed her paperwork Mr. Castillo and I then split the samples to the smaller vessels, which were then labeled. . . .

> \*     \*     \*

> Q   I need to clarify a couple of things. When you say you were tested together and you both submitted the test at the same time, were you both in the rest room at the same time?

A    No.

Q    You went in there individually?

A    Yes.

Q    And when you returned and you set your specimen on the desk, was Ms. Swann at the desk?

A    For most of the time that I know, when I was watching she was."

By letter dated May 5, 2001 - prior to the Investigation - the Claimant brought a number of perceived irregularities in the testing procedure to the attention of the Carrier's Manager Drug & Alcohol Testing Dr. M. Crespin including the following:

"I believe the circumstances of the random test were questionable and could have been manipulated. After providing our specimens, both Mr. Castillo and I sat our unmarked containers on the desk while Linda Swann, the technician, was filling out paperwork. During this 10 to 15-minute period, I did not remain at the desk. I walked around the room looking at the pictures on the wall, items on the table, etc. I even walked into the hallway. During this time the vessels were unmarked and within close proximity to each other. It is possible, and in this case highly likely, for the samples to have been labeled incorrectly."

By letter dated May 13, 2001, the Carrier's Manager Drug & Alcohol Testing M. Crespin responded to the Claimant that "[a]fter reviewing records of this test, it has been determined procedural irregularities did in fact occur; however, there were no procedural errors of magnitude that would cause the testing to be fatally flawed. . . ." By letter dated June 21, 2001, Crespin clarified the "procedural irregularities" he referred to in that the Claimant ". . . transported the secured bottles to the location where the Chain of Custody form was located, rather than the collector carrying the bottles herself." Crespin further stated in that letter

"[h]owever, the bottles were not unattended at any time and the integrity of the urine specimen collections remains intact."

By statement dated June 27, 2001 (which was made part of the Investigation held that date), the Claimant again reiterated that "Mr. Castillo and myself sat at a desk and set the large unmarked vessels on the desk [and f]or the next 10 to 15 minutes, Mrs. Swan was doing paperwork." In that statement, the Claimant also stated that "[d]uring this 10 to 15 minutes of paperwork I got up, walked around the room, looking at a picture on the wall and papers lying around on other tables. I also went into hallway." The Claimant again reiterated that position at the Investigation.

At the Investigation, and after the letters concerning the handling of the samples were made part of the record, the Organization stated:

> "MR. POPE: . . .
>
> We have shown that Mr. Martin Crespin, Manager Drug & Alcohol Testing, in his letter to Mr. Wallace admits procedural irregularities did in fact occur. . . . The collector did not ask or say anything to Mr. Wallace about remaining at the table while she was doing paperwork. There is no way of knowing what took place with two individual samples sitting there. Procedures were not followed correctly in this test."

The specimen collector - Swann - did not testify at the Investigation.

Rule 1.5 of the General Code of Operating Rules provides, in pertinent part:

> "The use or possession of intoxicants, over-the-counter or prescription drugs, narcotics, controlled substances or medication that may adversely affect safe performance is prohibited while on duty or on company property except medication that is permitted by a medical practitioner and used as prescribed. Employees must not have any prohibited substances in their bodily fluids when reporting for duty, while on duty or while on company property."

The burden is on the Carrier to demonstrate through substantial evidence that the Claimant engaged in the charged misconduct - here, a violation of Rule 1.5. Typically, that burden is met in these kinds of cases through the showing of a positive test result. Absent any other problems, that positive test result would constitute substantial evidence that the Claimant had a prohibited substance in his system in violation of Rule 1.5.

However, based upon what is before us, there are serious problems with the Claimant's test result. The above evidence shows that prior to and during the Investigation, the Claimant and the Organization repeatedly brought to the Carrier's attention their version of the testing procedure which showed that for 10 to 15 minutes, the two <u>unmarked</u> samples from the Claimant and Castillo sat on Swann's desk and that during that period, the Claimant walked around the room and even walked out of the room. Swann did not testify to contradict or clarify what happened to the two unmarked samples which were placed on her desk. Specifically, given that the status of the evidence developed during the Investigation shows that the samples were on Swann's desk and were unmarked, this record is devoid of any evidence showing how Swann knew that the sample labeled as the Claimant's was, in fact, his. Moreover, the Carrier's Manager Drug & Alcohol Testing Crespin acknowledged <u>prior</u> to the Investigation in his letters that "procedural irregularities did in fact occur," but he did not address the specific contention made by the Claimant concerning the unmarked samples left on Swann's desk.

Without evidence from Swann to contradict or explain the assertion that two unmarked samples were on her desk for 10 to 15 minutes; Manager Drug & Alcohol Testing Crespin's acknowledgement that "procedural irregularities did in fact occur" and given the Claimant's adamant denials of use of marijuana, we are unwilling to find that the Carrier met its burden and has shown through substantial evidence that the testing procedure was not compromised and that the sample tested and attributed to the Claimant was, in fact, the Claimant's specimen. Prior to the Investigation and with his letters, the Claimant put the Carrier on notice that there was a problem with respect to the testing procedures and specifically brought the problem concerning the unmarked samples to the Carrier's attention. During the Investigation, the Claimant and the Organization reiterated those objections. The Carrier had ample opportunity to rebut the assertions concerning the handling of the samples by Swann. However, the Carrier did not do so with probative evidence.

Without more, we are unwilling to uphold the dismissal of an employee with over 32 years of service.

The fact that the Claimant signed the chain of custody forms does not change the result. The Claimant and the Organization put the Carrier on notice that there was a specific problem with the testing procedure which could have seriously compromised the results. The Carrier had the obligation to rebut the specific issue raised. It did not do so.

Substantial evidence does not support the Carrier's assertion that the Claimant engaged in the charged misconduct. As a remedy, the Claimant shall be reinstated to his former position without loss of seniority or other rights and benefits, made whole in all respects and his record cleared of the charged disciplinary action.

## AWARD

Claim sustained.

## ORDER

This Board, after consideration of the dispute identified above, hereby orders that an award favorable to the Claimant(s) be made. The Carrier is ordered to make the Award effective on or before 30 days following the postmark date the Award is transmitted to the parties.

NATIONAL RAILROAD ADJUSTMENT BOARD
By Order of First Division

Dated at Chicago, Illinois, this 10th day of March 2004.

# NATIONAL RAILROAD ADJUSTMENT BOARD
# FIRST DIVISION

## LABOR MEMBERS' CONCURRENCE & DISSENT

### Interpretation No. 1 - Award No. 25971 – Docket No. 45876
### Referee Edwin H. Benn

We strenuously dissent to the Carrier being given the right to deduct outside earnings in this docket. We concur with the Referee's findings that in doing so, the Carrier may only consider the Claimant's *net* earnings from self-employment, and then only the amount of net earnings attributable to the increased time in self-employment spent as a result of the Claimant's dismissal.

With respect to the threshold issue of the deduction of outside earnings, the Referee has committed a grave error in allowing such to the Carrier. The Employees showed that on this particular part of the Carrier's property, the former Santa Fe, deductions for outside earnings have *never* been permitted in the case of a reinstatement handled by the relevant General Committee of Adjustment of the custodial Organization. The Carrier sought to attain this right, without negotiating over it, by simply asserting it when it came time to pay the backpay granted in the Award.

In justifying his decision, the Referee points to his understanding of a dismissed employee being "made whole," and an arbitrator's discretionary authority to fashion remedies. In support, he cites to case law interpreting the National Labor Relations Act, as well as internal guidelines used by the National Labor Relations Board in determining backpay. Throughout this discussion, the Referee expresses a personal disdain for granting reinstated employees "windfalls" via the literal application of rules requiring pay for *all time lost* for wrongfully dismissed employees.

The Referee also cites to the discipline rule's absence of a restriction on deductions as additional justification for granting same. The claim in this Docket was based on a rule requiring that a wrongfully disciplined employee be "...*compensated for the wage loss, if any, suffered by him.*" Employees under this rule have *always* been allowed backpay *without* deductions. Thus, the historical application of this rule requires that the wage loss occasioned by the wrongful discipline be paid *in full*. As Referee Moore correctly pointed out in one of the Awards cited to this Referee:

> "...In the absence of a rule which authorizes the deduction of outside earnings or a practice on the property of deduction of outside earnings, the Board finds that the deduction of outside earnings is not justified."

Thus, the Referee applied an inapposite analysis to this issue in order to reach the result dictated by his own concept of industrial justice.

In his entire discussion of this issue, the Referee never referred to the rule, except to say it contained no restriction on deductions, choosing instead to focus on the phrase "made whole." This is because *made whole* fit so neatly into the Referee's own view of the matter, and came with so much authority supporting his aversion to "windfalls." While the Referee does have broad remedial discretion, he is still limited by the Agreement, within whose four corners he must stay. By basing his grant of deductions on *his remedy*, and not *the rule*, the Referee both failed to interpret and apply the rule and granted the Carrier a right it clearly does not have under the Agreement. In this manner, he substituted his own brand of industrial justice for the Agreement, which was outside his discretion.

The Referee has improperly, and improvidently, handed the Carrier a much sought after right it has not been able to attain through negotiations. This represents an abuse of his discretion and the arbitral process. This portion of the Interpretation is thus infirm and should be set aside.

Richard K. Radek, Labor Member

Marcus J. Ruef, Labor Member

# NATIONAL RAILROAD ADJUSTMENT BOARD
## FIRST DIVISION

### INTERPRETATION NO. 1 TO AWARD NO. 25971

### DOCKET NO. 45876

**NAME OF ORGANIZATION:** (Brotherhood of Locomotive Engineers

**NAME OF CARRIER:** (BNSF Railway Company

On March 10, 2004, this Board issued the Award in this case, sustaining the claim and formulating the following remedy:

> "... As a remedy, the Claimant shall be reinstated to his former position without loss of seniority or other rights and benefits, made whole in all respects and his record cleared of the charged disciplinary action."

The dispute in this matter is over the meaning of "made whole". The Carrier offset outside earnings received by the Claimant from the time of his dismissal until his reinstatement. The Organization contends that the Carrier could not do so.

There are really two questions before this Board: (1) whether the Carrier can offset from the backpay owed the Claimant the outside earnings received by the Claimant from the time of his dismissal until his reinstatement?; and (2) if the Carrier can offset outside earnings, whether because the Claimant was self-employed after his dismissal, the Carrier must take into account expenses incurred by the Clamant in the operation of his business as a reduction of the amount the Carrier can offset? We find the answers to both questions are "yes".

## A. Can The Carrier Offset The Claimant's Outside Earnings?

With citation to authority from this Division (which authority is disputed by the Carrier), the Organization argues in its Submission at 2-3:

"... While deductions are commonly made in the non-operating crafts, and in other industries, the historical treatment of this issue is different for the operating crafts, and the general custom and usage of the phrase 'pay for time lost' has not included deductions for outside earnings. ..."

We find, as in similar cases before the other Divisions of this Board, that the Carrier can offset outside earnings earned by the Claimant from the backpay due the Claimant.

First, there is no specific contract provision which prohibits the Carrier from offsetting outside earnings from backpay awards. The point the Organization misses is that absent such prohibitive language (which, if it existed, we would be bound to follow), this Board's authority to formulate remedies is discretionary. See First Division Award 26088 where, after finding the employees were improperly dismissed and sustaining the claim, this Board offset outside earnings in the formulation of a make whole remedy:

"... [I]n the formulation of remedies, it has long been held that arbitration tribunals have substantial discretion for crafting a remedy to fit a particular circumstance. See United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 597 (1960):

When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency.

See also, Local 369 Bakery and Confectionery Workers International Union of America v. Cotton Baking Company, Inc., 514 F.2d 1235, 1237, reh. denied, 520 F.2d 943 (5th Cir. 1975), cert. denied, 423 U.S. 1055 and cases cited therein:

In view of the variety and novelty of many labor-management disputes, reviewing courts must not unduly restrain an arbitrator's flexibility.

The courts are particularly mindful of deferring to that discretion in decisions made in this industry. Union Pacific Railroad Co. v. Sheehan, 439 U.S. 89, 91, 94 [citations omitted]:

... [T]he scope of judicial review of Adjustment Board decisions is "among the narrowest know[n] to the law."

Congress considered it essential to keep these so called "minor" disputes within the Adjustment Board and out of the courts."

Second, it has long been held that where a contract violation has been shown, the purpose of a remedy is to restore the status quo ante and to make any adversely affected employees whole. See Wicker v. Hoppock, 73 U.S. (6 Wall.) 94, 99 (1867):

"The general rule is, that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury. The latter is the standard by which the former is to be measured. The injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed."

See also, W. C. Nabors Co. v. NLRB, 323 F.2d 686, 690 (5th Cir. 1963) ("... the 'make whole' concept does not turn on whether the pay was wholly obligatory or gratuitous, but on the restoration of the status quo ante.").

It was with that "make whole ... restoration of the status quo ante" approach in mind that we noted in First Division Award 26088:

"... [A] function of a remedy is to make an adversely affected employee whole. A remedy is not meant to reward the employee or make the employee rich."

The result argued for by the Organization is that an employee could be dismissed, earn substantial outside earnings after the dismissal, and then be reinstated

by this Board and allowed to receive full lost backpay from the Carrier in addition to the substantial outside earnings. That is a windfall for the employee and is directly contrary to the function of a remedy which seeks to restore the status quo ante and make the adversely employee whole. This Board has the discretion to not allow that result to occur.

Third, we can look to other sources as a guide in determining how to treat this issue. While not binding upon this Board, the National Labor Relations Board approaches backpay awards in the same manner argued for by the Carrier and found appropriate in First Division Award 26088 — i.e., to allow the Carrier to offset the Claimant's outside earnings. See NLRB Casehandling Manual, Part Three — Compliance Proceedings [emphasis added]:

    10530  Backpay

*        *        *

    10530.1 ...

    The goal in determining backpay is the same in all cases. The Act is remedial; when it has been violated, its intent is to restore the situation to that which would have taken place had the violation not occurred. Backpay awards are to make whole the person who has suffered from a violation for earnings and other compensation lost as a result of that violation. Backpay awards do not include punitive damages nor do they include compensation for collateral losses, such as from stress or credit problems. The backpay award should leave the discriminatee compensated as though the unlawful action had not occurred.

*        *        *

    Backpay is based first on the earnings a discriminatee would have had but for the unlawful action. Against this gross amount is offset the discriminatee's actual earnings from other employment that took place after the unlawful action ....

*        *        *

    10550  Net Backpay

10550.1 ...

> The final calculation of net backpay is simply all gross backpay <u>minus all offsets from interim employment</u> within the backpay period."

Fourth, in this case and given the facts presented, we choose to exercise our discretion to not allow the Claimant to be the beneficiary of a potential windfall.

Fifth, we are cognizant of a line of authority cited by the Organization that "... this issue is different for the operating crafts ...." But the bright line of precedent the Organization seeks to paint does not exist. The Carrier has cited us to awards of this Division and boards involving the operating crafts where outside earnings <u>have</u> been offset from backpay awards. See PLB No. 3491, Interpretation to Award No. 1:

> "The matter of deduction of outside earnings is one of the most disputatious issues in this industry. It stems from the fact that this Organization [the UTU] has refused to concede that the common law rule of damages has general applicability to situations where employees are reinstated under contracts that provide for payment for all time lost. The Organization maintains that such provision must be literally applied, and that even if the affected employee lost little or no compensation as a result of being unjustly disciplined. The prevailing legal concept that the employee should be whole but not unjustly enriched, has not been accepted by the Organization. The record is clear that in the early days of the First Division, the Organization's view predominated."

\* \* \*

We find that the former older awards are not persuasive or binding since they are not in conformance to the current holdings of federal courts regarding damages, and that the terms "all time lost" must acknowledge and give credit to outside earnings, if any, that Claimant received during the period that he was out of service.

See also, Interpretation No. 1 to First Division Award 24718:

In sustaining this claim for "... all earnings lost as a result of the unjustified discipline ...." it is the intent of this Board that the Claimant be "made whole", i.e., that so far as possible Carrier must restore him to the status and position he would have been in but for the violation of his rights under the Agreement. It is our intent that he be compensated monetarily in an amount neither less not [sic] more than the earnings he would have made if he had been retained in the Carrier's service during the period he was wrongfully discharged. Perforce, and in accordance with the well-established precedent and principles, this means offsetting his outside earnings, if any, during the period in question ...."

Further, see First Division Awards 25932 ("Backpay will be subject to all appropriate offsets, including unemployment compensation he received and any earnings he may have had from other employment during the period of his dismissal"); Interpretation No. 1 to Award No. 25309 ("... the Carrier has a right to use outside earnings to offset any money that might be due ... [a]n employee should not rewarded with a windfall as a result of the Award"); 24156 ("The Claim must be sustained compensating the Claimant for all time lost, subject to deductions of outside earnings"); 15765 ("His earnings so made are deductible from the amount he would have made but for the breach in determining the amount of damages he is entitled to receive from the party committing the breach of contract."). Additionally, see PLB No. 6681, Award No. 2; PLB No. 6192, Award Nos. 7, 34; PLB No. 5760, Award No. 41; PLB No. 5726, Award No. 9; PLB No. 4901, Award Nos. 127, 207.

As part of the make whole remedy fashioned in this case, the Carrier shall therefore be allowed to offset Claimant's outside earnings from the time of his dismissal until the time of his reinstatement.

### B. Must The Carrier Reduce The Amount Of Outside Earnings It Can Offset By The Amount Of Expenses Incurred By The Claimant's Self-Employment?

The record shows that during the period after his dismissal until his reinstatement, the Claimant was self-employed. The Carrier offset the income the Claimant received, but did not reduce that amount by the expenses the Claimant incurred from his self-employment.

First, in order to make the Claimant whole, if the Carrier is going to offset income from the Claimant's self-employment, then it must also reduce that amount by expenses the Claimant incurred as a result of his self-employment. Again, the purpose of a remedy is to restore the status quo ante. To not require the Carrier to factor in the Claimant's expenses would not restore the status quo ante.

Second (as a guide) this Board can again look to how the National Labor Relations Board treats these issues. See NLRB Casehandling Manual, Part Three -- Compliance Proceedings, supra:

> "10541.3  Self-Employment: ...
> Net earnings from self-employment during the backpay period should be offset against gross backpay.
> ... In general, net earnings are the difference between gross receipts and offsetting expenses."

The amount the Carrier should be able to offset from self-employment is only the *net* earnings the Claimant realized from his self-employment — i.e., gross receipts less expenses. To the extent that the Claimant may have operated his self-employment venture at increased levels as a result of his being dismissed, the only portion of the amounts that are subject to offset by the Carrier are those receipts less expenses which the Claimant received or spent as a result of that increased time spent in his self-employment.

The Claimant shall be "made whole" consistent with the terms of this Interpretation. The Carrier is entitled to offset outside earnings against the gross backpay owed the Claimant from the time he was dismissed until he was reinstated. The Carrier can also reduce the Claimant's backpay entitlement by amounts the Claimant earned through self-employment, but those amounts must only be the Claimant's net earnings from his self-employment (i.e., gross receipts less expenses) and then only for the increased time, if any, that the Claimant spent in self-employment as a result of his dismissal.

Referee Edwin H. Benn who sat with the Division as a neutral member when Award 25971 was adopted, also participated with the Division in making this Interpretation.

NATIONAL RAILROAD ADJUSTMENT BOARD
By Order of First Division

Dated at Chicago, Illinois, this 18th day of November 2005.

# Tab 6-4

National Railroad Adjustment Board, First Division –
Award No. 25243

Form 1          NATIONAL RAILROAD ADJUSTMENT BOARD
                          FIRST DIVISION
                                              Award No. 25243
                                              Docket No. 44918
                                              01-1-00-1-U-2147

        The First Division consisted of the regular members and in addition Referee
Elizabeth C. Wesman when award was rendered.

                        (Brotherhood of Locomotive Engineers
PARTIES TO DISPUTE: (
                        (Union Pacific Railroad Company

STATEMENT OF CLAIM:

        "Claim in behalf of Engineer R. E. Nevens, SS No. 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, Chicago
        Freight Terminal, for reinstatement to service with vacation and seniority
        rights unimpaired, compensated for any and all lost time spent out of
        service due to this investigation, compensated for any and all medical
        expenses incurred while claimant's insurance had lapsed, and this incident
        be removed from claimants' personal record and he be removed from the
        Union Pacific Discipline System know as Upgrade, when Engineer R. E.
        Nevens, was investigated on the following charge:

        'your allegedly submitted a fraudulent time claim, claim receipt no.
        00790796, for an eight hour penalty payment for allegedly being denied a
        meal period by MITO A. Chappelle on the date of January 30, 1999.

        You are charged with responsibility that may involve a possible violation
        of GCOR as follows: Rule 1.3.1 Rules, Regulations and Instructions.
        'Explanation: Employees must ask their supervisor for an explanation of
        any rule, regulation, or instruction they are unsure of.' Rule 1.4 Carrying
        Our Rules and Reporting Violations: 'Employees must cooperate and
        assist in carrying out the rules and instructions. They must promptly
        report any violations of the proper supervisor. They must also report any
        misconduct or negligence that may affect the interest of the railroad.' Rule
        1.6 Conduct: Employees must not be..4. Dishonest . . .' General Notice No.
        GN088 effective May 10, 1999.'"

FINDINGS:

The First Division of the Adjustment Board, upon the whole record and all the evidence, finds that:

The carrier or carriers and the employee or employees involved in this dispute are respectively carrier and employee within the meaning of the Railway Labor Act, as approved June 21, 1934.

This Division of the Adjustment Board has jurisdiction over the dispute involved herein.

Parties to said dispute were given due notice of hearing thereon.

On January 30, 1999, the Claimant was working in the Chicago Terminal at Global 1, an Intermodal yard, as engineer on an extra yard engine. Upon reporting for duty, the Claimant alleges that his Conductor received instructions for the day stating that they were denied a meal period. The Conductor allegedly told the Claimant that they were denied a meal period from Global one, SYO Paula and Norm Chappelle, MITO. The Claimant entered his time slip for eight hour's penalty due to being denied a meal period per Paula and Chappelle. The claim worked its way through the handling process and timekeeping. MITO Chappelle was asked to verify the authorization and he reported he was not on duty the date of the claim. On September 9, 1999, the Claimant was removed from service and cited to a formal Investigation for allegedly violating GCOR Rules 1.3.1, 1.4 and 1.6 for submitting a fraudulent time card.

Based on the findings of the Investigation, the Claimant was dismissed from service on September 10, 1999. However, the Carrier eventually reinstated the Claimant.

The Organization first contends that the claim must be sustained in its entirety because of various procedural violations relating to notice and timing of the Investigation and the Claimant's right to a fair Hearing. More specifically, the Organization argues that the claim must be sustained because the holding of the Investigation was clearly beyond the time limits set forth in the 1996 System Discipline Agreement, that 213 days had passed since the date of the incident, that witnesses no longer had a clear recollection of the events, that pertinent evidence could no longer be found in the computer and that the Carrier failed to call the appropriate witnesses resulting in an unfair Hearing.

The essential facts in this case are nearly identical to those found in First Division Awards 25240, 25241 and 25242. Similarly in this case, the Carrier declined to call witnesses material to supporting its case, and allowing the Claimant to mount a full and informed defense. Further, as noted in those Awards, although the Carrier may have arguably held the investigatory Hearing within the time limits set forth in the Agreement, taking into account when the Carrier had confirmed knowledge of the matter, the Carrier still failed to provide crucial documentary and testimonial evidence when, at last, the Hearing was held. For that reason and the reasons set forth in considerable detail in First Division Awards 25240 and 25241, the present claim is sustained.

## AWARD

Claim sustained.

## ORDER

This Board, after consideration of the dispute identified above, hereby orders that an award favorable to the Claimant(s) be made. The Carrier is ordered to make the Award effective on or before 30 days following the postmark date the Award is transmitted to the parties.

NATIONAL RAILROAD ADJUSTMENT BOARD
By Order of First Division

Dated at Chicago, Illinois, this 10th day of July, 2001.

NATIONAL RAILROAD ADJUSTMENT BOARD
FIRST DIVISION

INTERPRETATION NOS. 1 TO AWARD NOS. 25242, 25243, 25244

DOCKET NOS. 44917, 44918, 44919

<u>NAME OF ORGANIZATION:</u>  (Brotherhood of Locomotive Engineers

<u>NAME OF CARRIER:</u>  (Union Pacific Railroad Company

The Parties have requested an interpretation of the above listed awards. At issue in their petition is the matter of proper calculation of vacation time accrued, despite the fact that they were not actually on the job during the time for which they have received back pay.

The parties have requested an additional interpretation from the Board in this matter, because they are in disagreement with regard to whether the Claimants in the above-referenced cases are entitled to receive credit toward earned vacation days for the time they were suspended from service. In a prior interpretation, the Board held the following.

Again, it is appropriate to review the initial or seminal Award in this "series"; i.e., Award 25240 (Docket No. 44915). In that Award, the Board specified that "this claim be sustained in full and the Claimant <u>be made whole</u> for time lost." (Emphasis added). As the Board found in the first interpretation on this matter:

"It is clear from the language of the Board in this initial case, that the Board intended for the Claimant in that case and in all the related cases to be "made whole." That is, each claimant should be reimbursed for <u>pay lost</u> as a result of the time spent on suspension. In those instances where Claimants were able to find outside employment during their time spent on suspension, however, such earnings must be deducted from back pay calculations, if the resulting reimbursement is in fact a "make whole" remedy, as the Board intended. To further illustrate this principal, if a Claimant were employed during that time and his/her

medical expenses were paid by the outside employer at a level they
would otherwise have been paid by Carrier, had Claimant remained in
Carrier's service, no reimbursement for such expenses would be owed
Claimant."

It is clear from the foregoing that the Board did not find the Claimants were
entitled to a "windfall" gain. Thus, it held that the Carrier could deduct outside
earnings from the Claimants' back pay awards. Consistent with the same reasoning, if
the Claimants are to be made whole, they must be restored to the status they would
have been in, both financially and in terms of their vacation time earned, if they had not
been suspended.

Accordingly, the Board finds that the Carrier must credit the time spent on
suspension toward the Claimants' vacation accrual. Otherwise, there can be no
argument that they have, in fact, been made whole.

Referee Elizabeth C. Wesman who sat with the Division as a neutral member
when Award 25242-44 was adopted, also participated with the Division in making this
Interpretation.

NATIONAL RAILROAD ADJUSTMENT BOARD
By Order of First Division

Dated at Chicago, Illinois, this 5th day of January 2006.

NATIONAL RAILROAD ADJUSTMENT BOARD
FIRST DIVISION

INTERPRETATION NO. 2 TO AWARD NOS. 25242, 25243, 25244

DOCKET NOS. 44917, 44918, 44919

NAME OF ORGANIZATION: (Brotherhood of Locomotive Engineers

NAME OF CARRIER:          (Union Pacific Railroad Company

The Parties have requested an interpretation of the above listed Awards. At issue in their petition is the matter of proper calculation of backpay in the case of employees whose claims have been sustained, when those employees also had some amount of outside earnings during the time they were suspended from service.

The Organization's position is based upon a number of difference theories of this case. It argues at the outset that, since the Awards in these cases stated simply "claim sustained," that the claims must be sustained as presented. Further, since no claim mentioned "less outside earnings" such earnings may not be deducted by the Carrier in calculating the appropriate amount of backpay due each Claimant. The Organization also refers to a decision by the United States District Court for the District of Wyoming (Case No. 02-CV-086-B) in which the Court refused to remand to Public Law Board No. 6040 its Award 98, involving these same parties. In that case, the Board had awarded in pertinent part as follows:

> "2)  The discharge penalty is modified to a ninety day suspension without pay, with reinstatement to service and back pay for time served in excess of said ninety day disciplinary period."

In its opinion, the Court did not find that there was justification for the Award to be remanded to the Board regarding the matter of offset for outside earnings, since the original Award made no such mention of such a deduction in its Award. Accordingly,

the Court held that the Award in question should be enforced as written, and it denied the Carrier's petition for dismissal, as well as its request for remand to the Board.

The Organization contends that beyond the District Court's holding, past practice on the property, as evidenced by certain intra-Carrier correspondence on this record, supports their position that backpay has been awarded without regard to any possible outside earnings during the time a claimant was out of service.

The Carrier maintains that there is no such past practice of granting backpay without deducting an employee's outside earnings from the calculation. On the contrary, the Carrier asserts that the correspondence cited by the Organization is merely a partial record of what actually transpired, and that the Claimants who were erroneously issued checks for the full amount of time lost were subsequently notified that they were expected to supply the Carrier for W-2 forms covering the time they were suspended so that outside earnings could be deducted from the amount of their backpay. Moreover, the Carrier notes that in at least one case, the Carrier put a stop on its original check pending the Claimant's compliance with the Carrier's request for the relevant W-2 forms.

The Board reviewed the records and its Awards in these cases extremely carefully. The Board acknowledges that, at first reading, it appears that no mention has been made of deduction for outside earnings. Rather, each of the Awards in the cases cited above states simply "Claim sustained." However, in order to assess whether those Awards contemplated the deduction of outside earnings from the backpay awarded, it is essential to read the entire Findings section of the Board. In First Division Award 25242, for example, the last sentence of the Findings reads as follows:

> "This case is nearly identical to First Division Awards 25240 and 25241.
> For the reasons set forth at length in those Awards, the instant claim is
> sustained based upon the fatal procedural errors made by Carrier."

Accordingly, in order to come to any meaningful Interpretation of the intention of the Board in the cases at issue here, one must review the initial or seminal Award in this "series"; i.e., First Division Award 25240. In that Award, the Board specified that "this claim be sustained in full and the Claimant be made whole for time lost." (Emphasis added)

It is clear from the language of the Board in this initial case, that the Board intended for the Claimant in that case and in all the related cases to be "made whole." That is, each Claimant should be reimbursed for pay lost as a result of the time spent on suspension. In those instances where the Claimants were able to find outside employment during their time spent on suspension, however, such earnings must be deducted from backpay calculations, if the resulting reimbursement is in fact a "make whole" remedy, as the Board intended. To further illustrate this principal, if a Claimant were employed during that time and his/her medical expenses were paid by the outside employer at a level they would otherwise have been paid by the Carrier, had the Claimant remained in the Carrier's service, no reimbursement for such expenses would be owed the Claimant.

In light of the foregoing, the Board finds that the Claimants in the cases at issue here shall receive backpay for time lost, less their outside earnings, if any.

Referee Elizabeth Wesman who sat with the Division as a neutral member when Award 25242 was adopted, also participated with the Division in making this Interpretation.

NATIONAL RAILROAD ADJUSTMENT BOARD
By Order of First Division

Dated at Chicago, Illinois, this 5th day of January 2006.

# NATIONAL RAILROAD ADJUSTMENT BOARD
## FIRST DIVISION

### CARRIER MEMBER'S DISSENT

**Interpretation No. 1 – Awards Nos. 25242-25244**
**Dockets Nos. 44917-44919**
**Referee Elizabeth C. Wesman**

Over 50 years of interpretation of the National Vacation Agreement by the Section 10 Committee are ignored in this interpretation regarding back pay qualifying an employee for vacation. The Committee routinely held that for a TE&Y employee to qualify for vacation, he or she must actually perform service. Simple disagreement with the Section 10 Committee (which was comprised of both management and union members) awards does not justify ignoring those awards.

*Charles R Wise*

Charles Wise
Carrier Board Member

# NATIONAL RAILROAD ADJUSTMENT BOARD
## FIRST DIVISION

### LABOR MEMBERS' DISSENT

**Interpretation No. 2 - Awards Nos. 25242-25244**
**Dockets Nos. 44917-44919**
**Referee Elizabeth C. Wesman**

In allowing the Carrier the right to deduct outside earnings from the back pay awarded in these Dockets, the Referee cites to the "make whole" remedy she fashioned, and states as dicta that the deduction of outside earnings is, to her, a natural extension of being made whole. This logic is not based on the operative language of the rule at bar, the 1996 UP System Discipline Agreement, which provides that Claimants such as those in these Dockets will be allowed "all time lost," and also provides a very specific, detailed scheme for determining the amount due, which is significantly silent with respect to any deductions or offsets.

The Employees were very careful to make the Referee in these Dockets aware of the very long line of Awards and Interpretations addressing the phrase "time lost" in this context. With very rare exceptions, this and like phrases have been interpreted by this Division, and other tribunals with common jurisdiction, to _not_ allow for deductions or offsets.

The 1996 UP System Discipline Agreement was negotiated by parties who were aware of this issue, yet chose not to address it. Their omission of any offset for outside earnings from the formula can only mean that they did not intend to allow for such deductions. This is further buttressed by the fact that deductions were only recently attempted for the first time since the adoption of the 1996 Agreement. The Referee has thus failed to interpret and apply the actual remedy prescribed by the Agreement, and the Award and Interpretation are abjectly incorrect to that extent.

_Richard K. Radek_

Richard K. Radek, Labor Member

_Marcus J. Ruef_

Marcus J. Ruef, Labor Member

# Tab 6-5

United Transportation Union and Kansas City Southern Railway Company, Public Law Board 6670 – Award No. 8

PUBLIC LAW BOARD 6670

Case No. 8
Award No. 8
Carrier's File No. G0201-2638
NMB Code: 119/173
Claimant Brakeman Dennis R. Caufield

PARTIES TO THE DISPUTE:

UNITED TRANSPORTATION UNION

AND

KANSAS CITY SOUTHERN RAILWAY COMPANY

Statement of Claim:

Request for removal of discipline, reinstatement to service with seniority
unimpaired, restoration of benefits, and payment for time lost account Brakeman
Dennis R. Caufield was improperly dismissed as a result of formal investigation
held March 23, 2001.

Findings:

Upon the entire record and all the evidence, this Board finds the parties herein to
be Carrier and Employees within the meaning of the Railway Labor Act, as amended,
and that this Board has jurisdiction of the parties and over the dispute involved herein.

On Friday, March 16, 2001, the Claimant was the Brakeman on the Slater
Local working with an Engineer and a Conductor with the protection of a track warrant.
Their train was working between Mileposts 435 and 392. At the end of their shift they
proceed to Slater, MO (MP 393.6) in order to place the engine and one car into the
west elevator track. While the Conductor dismounted the train and worked primarily at
the west end of the siding to protect the shove of the engine and car into the track. The
Claimant remained on the engine until he and the Engineer could unload their gear at
the depot before pulling into the siding.

The Claimant rode the point of the shove and coupled the train to the cars already in the track. He then connected the air hoses so that the Engineer could shove past the derail at the east end. The Claimant then repositioned the derail at the east end. The Claimant reportedly then walked to the depot without realigning the east end switch to allow normal main line movement. The Engineer released the track warrant believing the track was ready for main line movement.

At approximately 11:45 p.m. westbound Train MESKSBN-16 ran into the engine the Slater Local crew left in the siding by the Claimant's crew. Two crew members were hospitalized and two engines were destroyed and several cars damaged. The damage was estimated at about $600,000.00.

By letter dated March 19, 2001, the Slater crew was removed fom service and directed to attend a formal Investigation to be held in the Conference Room, KCS Officer Building, Kansas City, MO, on March 23, 2001. The purpose of the hearing was to determine their responsibility, if any, in allegedly failing to realigned the east switch at the Elevator Track (MP 393.6), on Friday, March 16, 2001. The letter stated that te failure to align the switch resulted in Train MESKSBN-16 entering the siding and colliding with KCS Engine 4812 causing an injury and severe damage to the locomotives and several cars.

The Carrier argues there was substantial evidence through the testimony presented at hearing, including that of the Claimant, to prove the Claimant was responsible for not aligning the east end switch after his train was shoved back into the siding. In fact, they say, UTU concedes the guilt. They contend the Organization's only argument was that the discipline assessed was "grossly excessive." They discount the Union's assertion that the Claimant should be given consideration because he volunteered to work away from his home district.

The Carrier asserts the Organization did not raise any procedural issues at hearing. They submit the only issue is the degree of discipline. They say the Organization has the burden of proof in any subsequent claims.

The Carrier insists the Investigation was conducted fairly with the Claimant receiving all contractual due process rights. They insist he was primarily responsible for the failure to realign the switch at the east end of the siding. This caused a horrific accident which resulted in over $600,000.00 worth of damage and personal injuries.

The Carrier maintains that even if the Board determines the discipline was too harsh, there should be no monetary award since unless the Claimant can demonstrate his employment with the Burlington Northern and Santa Fe Railway Company resulted in less earnings than his employment with KCS would have been had he been reinstated earlier.

The Carrier also points that the Board has limited authority as an appellate body. They argue that the Carrier had the right to assess discipline based on the degree of culpability among the crew members. They say it was obvious the Claimant was the sole member of the crew who was expected to line the switch. They contend he walked right past the switch but did not line it for main track movement after his train was placed in the side track. They argue Boards have historically overturned discipline when every employee was treated the same. In this case, they insist, the Claimant did not have long-term employment with the Carrier that warranted leniency.

The Organization argues that the Carrier violated Rule 39, Discipline and Investigation when they permitted one Carrier Officer to serve as prosecutor, judge, jury and executioner. They reference PLB Decisions which support this contention. They also claim the Carrier violated Rule 40, Time Limit On Claims when they did not hold an appeals hearing within the required 15 days from the appeal. They argue these violations are sufficient to sustain the grievance.

As to the merits, the Organization argues the crew did conduct a job briefing but the Hearing Officer neglected to explore the division of labor agreed to by the crew. They argue there is no way of knowing whether the crew decided the Claimant would be responsible for realigning the east end switch. Moreover, the Organization argues the Claimant was new to the territory and was not totally familiar with the territory or

how duties of the crew members were coordinated. They contend the other crew members should have scrutinized the Claimant more carefully. They argue the Engineer assumed the Claimant had realigned the switch but never really verified that the switch was thrown before releasing the track warrant.

Finally, they cite the differences in the discipline assessed. They contend the Engineer and the Conductor have always been jointly responsible for the safe operation of their train and in charge of the rest of the crew. They assert the Claimant, who had the least responsibility, was the crew member who received the greatest discipline. They say if anything, his discipline should have been no greater than the Conductor's. They contend the discipline assessed the Claimant was harsh and excessive. They submit the accountability should have been borne equally.

The Organization believes there was no need for discipline to impress upon the crew the seriousness of their failings. They say they will suffer sufficient mental anguish over the injuries resulting from the accident as well as the costs of the resulting damages.

Although the Organization admits the Claimant has had a brief career, they point out that this was his first Investigation. His record was clear to this point.

DECISION

The Board does concur with the Carrier that it is not disparate treatment for an employer to assess a harsher discipline to an employee who has greater responsibility for a rule violation. Certainly if one crew member was told during a job briefing to perform certain tasks and s/he failed to perform those tasks, then it would be improper to hold other crew members equally responsible.

In this case, unfortunately, there is no evidence presented that there was a job briefing to delineate the responsibilities of each crew member. Although common sense may indicate that the crew member closest to the switch was the one responsible

for realigning the switch, there is no evidence to suggest that it was ever determined at a job briefing who would throw the switch. In addition, both the Engineer and the Conductor were concerned, after-the-fact, about whether the switch had ever been thrown. If they had conducted a job briefing you would not think they would have had any doubts about whether the switch was thrown.

We concur that the joint responsibility for assuring the safe operation of a train and compliance with all the rules is held by the Engineer and the Conductor unless one or both are guilty of rule violations. In that case, the other members of the crew have an obligation to either report the infractions or demand that the rules are followed.

There is no question that the accident was caused by the failure of the crew to realign the switch for main track movement. It was a serious error and deserving of a severe penalty. Be that as it may , there is no evidence the Claimant had greater culpability than the Engineer and the Conductor, both of whom were not sure the switch had been thrown. Either or both could have walked the short distance to check the switch before they left the yard, especially since they obviously were worried about whether it had been thrown.

For all of these reasons, we do not believe there is sufficient evidence to establish that the Claimant was primarily responsible for not throwing the switch. Therefore, he should not have been disciplined any more harshly than the Engineer and the Conductor.

## AWARD

The claim is sustained to the extent the termination is to be reduced to a sixty (60) day suspension and the Claimant is to be offered reinstatement. However, any back pay is to be reduced by any other outside earnings and unemployment compensation received.

The Claimant will have thirty (30) days after receipt of the Carrier's notice to report to duty to arrange for the necessary tests and examinations for his return to employment.

The Carrier will comply with this Decision within thirty (30) days of its receipt.


_Carol J. Zamperini_
Carol J. Zamperini
Impartial Neutral and Chairperson


_Kathleen A. Alexander 6/5/04_        _M. B. Futhey, Jr._
Kathleen A. Alexander                    M. B. Futhey, Jr.
Carrier Member                           Employee Member

_Dissenting to earnings offset attached_


Submitted this 12th day of March, 2004.

Board Member Dissent

Public Law Board 6670

Award No. 8

    The Neutral member supports the Organization position in part to which the Organization Member concurs, however, the neutral then offsets lost wages improperly with compensation received by the claimant while dismissed from the service of the Carrier. This property (Gateway Western) has never had compensation offset by outside earnings when the position of the Organization is sustained in an award and shouldn't in the instant case.

    During the oral hearing, the issue of outside earnings was not even argued in the instant case. However the Neutral Member takes it upon herself to rule on this important issue without input from the Organization. Accordingly, the Organization continues to claim for all lost earnings in future cases and considers the referenced case as without standing.

Employee Member,

M. B. Futhey, Jr.
Vice President UTU

# Tab 6-6

*Brotherhood of Maintenance of Way Employees v. Burlington Northern Santa Fe*, Public Law Board No. 6204

## Public Law Board No. 6204

## Parties to Dispute

Brotherhood of Maintenance of Way )
Employees )
)
vs )    **Case 11/Award 11**
)
Burlington Northern Santa Fe )

## Statement of Claim

Claim of the System Committee of the Brotherhood that:

1. That the thirty (30) day suspension of Machine Operator R. A. Fritz for alleged violation of Safety and General Rules 567, 585 and 589 in connection with a personal injury was improper and a violation of the labor Agreement.

2. As a consequence of the violation referred to in Part (1) above, the Claimant's record shall be cleared of the charge leveled against him and he shall be compensated for all wage loss suffered.

## Background

The Claimant was advised on March 17, 1994 to attend an investigation in order to determine facts and place responsibility, if any, in connection with an alleged personal injury which he sustained while working at ~~Boardview~~ Broadview, Montana on March 11, 1994 and with his failure to report this injury. After an investigation was held on March 23, 1994 the Claimant was advised that he had been found guilty "of failure to promptly report an injury to (his) supervisor...". He was assessed a thirty (30) day suspension. The Claimant's suspension letter states the following, in pertinent part, which is cited here for the record.

"You are hereby suspended from the service of the Burlington Northern Railroad for a period of thirty (30) days effective April 21, 1994 through and including May 20, 1994 for violation of BN Safety Rules and General Rules 567 for your failure to exercise proper care and judgment resulting in your injury of March 11, 1994 and...for your failure to promptly report this injury to your supervisor in a timely manner as indicated in the investigation afforded you on March 23, 1994...".[1]

This suspension was appealed in the proper manner on property under Section 3 of the Railway Labor Act and the operant Agreement up to and including the highest Carrier officer designated to hear such. Absent settlement of this claim on property it was docketed before this Board for final adjudication.

## Dual Jurisdiction Question

The letter of appeal states that the Organizaton requests that "...Mr. Fritz be paid, at his proper rate of pay, for all time lost as a result of this improper discipline...".

The record shows that the Claimant last "...rendered compensated service..." for this Carrier on March 30, 1994. This was prior to the time he was to serve the thirty (30) day suspension assessed after the March 23, 1994 investigation was held.[2]

The record also shows that the Claimant, with representation by an attorney, settled a claim involving an incident which took place at "...Broadview, Montana (on) 3/11/94...". There can be little doubt in the mind of the Board that the claim filed by the Claimant's attorney deals with the same event involved in the instant case.

---

[1]Employees' Exhibit A-1.

[2]Employer's Notice of Qualifying Event signed by a representative of the BNSF on October 29, 1994.

As a result of the claim filed by the Claimant's attorney a settlement was arrived at between the Claimant/Attorney and the BNSF with provision whereby the Claimant started to receive disability retirment on the date of September 30, 1994.

The question remains whether the separate claim filed by the Organization on behalf of the Claimant for payment for the suspension dates of April 21-May 20, 1994 remains valid in view of the settlement negotiated on behalf of the Claimant on September 30, 1994. This issue will be addressed by the Board since the Carrier introduces the language of the settlement agreement, in pertinent part, for consideration by this Board. The language of the settlement agreement states the following which will be cited here for the record:

> "In further consideration of this settlement, it is understood (that) the injuries I, Robert A. Fritz, have sustained will forever and permanently disable me from returning to work for Burlington Northern Railroad Company or any of its subsidiaries, and I hereby release any claim or right which I have to return to employment with the Burlington Northern, and I hereby specifically agree that I will not apply for or seek employment with Burlington Northern Railroad Company at any time in the future. In further consideration of this settlement, it is understood and agreed that I will not progress any claim or pursue any remedy that may be available to me under the provisions of 42 USC Sections 12101 et seq., (popularly referred to as the American with Disabilities Act of 1990), and that any such claims or remedies have been settled...".

In view of the above language, as well as all other information of record in this case, the Board is not persuaded that it should not address the merits of the claim before it. Under the settlement agreement negotiated between the Carrier and the Claimant's attorney, the Claimant has agreednot to return to work for the Carrier and/or to progress any claim under the American with Disabilities Act. The language does not state that the Claimant

forfeits his right to progress a claim filed on his behalf under the Railway Labor Act and

the operant Agreement for allegedly having been improperly disciplined because of the

manner in which the injury he sustained on March 11, 1994 was reported.

## Discussion & Findings

The record shows that the Claimant was assigned to work as a crane operator in

the ~~Boardview~~ Broadview, Montana area on March 11, 1994 which was a Friday. He was operating a

Pettibone crane. When the Claimant started work on that day he had a bucket attached to

the boom of his crane. Because he had to move some railroad ties and rails he needed a

fork attachment on his boom. The incident involving the Claimant's injury took place

when he took the bucket off the boom and installed the fork.

The common procedure for removing a bucket is to lower the boom and set the

bucket on the ground and then remove the pins attaching the bucket to the boom. Then

the boom is moved and lined up to the fork. At that point pins have to be inserted to

attach the bucket to the boom. This is a fairly elementary procedure. The practical

problem usually centers on lining up the holes to insert the pins on the piece of equipment

being attached to the boom. Operators commonly use a short iron bar and a hammer to

line up the holes in order to insert the pins.

Testimony at the investigation is that it was common procedure for an operator to

have some help when removing and installing attachments to booms. But it was also

common practice for operators to change attachments singlehandedly. The latter is a point

of some importance in this case since the Carrier implies that it was unsafe for the Claimant to have tried to change the boom attachments by himself.

According to the record, the Claimant had planned to have an assistant help him on the day in question change the attachments to his boom. But when it was time to change the attachments the assistant was not there. So the Claimant attempted the installation of the fork on the boom of his crane by himself. While doing so he felt a "crick" in his back. Shortly after the Claimant states that he felt a "crick", two fellow workers did arrive on the scene and they helped the Claimant put one of the pins in to hold the fork to the boom so that he could get on with his work. It was when the Clamant was lining up the holes to attach the fork to the boom, and trying to get the fork attached to the boom, that he did feel the "crick" in his back. The Claimant testified that he did not pay much attention to this "crick". Information of record is that it is not uncommon for crane operators to feel such "cricks" and/or other aches and pains as normal side-effects of their job. The Claimant testified that he felt the "crick" while attempting to hammer a pin in place while holding the fork with an iron bar.[3] He states that he then "straightened up and stretched out...and did not feel quite right...". So he went and sat on the seat of the crane to rest his back. After that, he testified, he "...did feel better...". The Claimant states that he did not report anything to his supervisor because he felt okay and worked the rest of the day.

---

[3]This was the third pin holding the fork to the boom. The Claimant had already inserted the two others by himself.

Throughout the following week-end and on the following Monday the Claimant continued to feel some discomfort which he associated with the normal aches and pains related to his normal railroad duties. During the night on Tuesday of the following week, however, the Claimant began to feel some numbness in his leg. When the Claimant went to work on Tuesday he contacted his foreman and asked for paper work in order to fill out an injury report because his leg was still feeling numb. The Claimant testifies that he was subsequently told by two doctors who examined him that the numbness in his leg was related to the "crick" he felt in his back on the preceding Friday.

In view of the record before it the Board concludes as follows. That the Claimant sustained an injury from having changed the attachments on the boom of his crane on the date of March 11, 1994 cannot be disputed. The first issue is whether the injury was caused by the Claimant attempting to change the attachments by himself rather than with help. There is sufficient evidence of record to warrant conclusion that it was not uncommon for operators to change attachments without assistance. In fact, according to statements by other operators which were offered to the Carrier during the handling of this case on property, which is acceptable evidence of record, it was quite common for operators to change attachments by themselves.[4] This is, in fact, never disputed by the Carrier during the handling of this case on property. Thus reasonable minds would conclude that this in itself is insufficient grounds to conclude that the Claimant was

---

[4] See Employees' Exhibit A-6 and attachments.

negligent and unsafe in the conduct of his duties. The second issue centers on whether the Claimant was negligent in not reporting an injury when he felt a "crick" in his back on the date of March 11, 1994 while changing the attachments on his boom. Subsequent medical diagnoses established that there was a relationship between the "crick" the Claimant felt on March 11, 1994 and the subsequent numbness in his leg which he felt on March 15, 1994 which was some four days later. But the Claimant himself testifies at the investigation that he did not feel any out of the ordinary pain from the March 11, 1994 "crick" until four days later. There is simply no evidence of record to warrant conclusion that the Claimant acted in a devious manner and/or that he attempted to deliberately deceive supervision by waiting four days to advise supervision of the numbness he was feeling in his leg. On the face of it this Board can find no grounds for concluding that the Claimant deliberately attempted to circumvent his obligations to report an injury while on the job.

The Rules at bar in this case are the following.

**Rule 567**

Employees must:
        a. Not incur risk which can be avoided by exercise of care and judgment.
        b. Take time to work safely.
        c. Exercise care to prevent injury to themselves and others.

**Rule 585**

All accidents/incidents must be reported to immediate supervisor as soon as possible by first available means of communciation...

**Rule 589**

An employee having any knowledge or information concerning an accident or injury to himself or others must complete Form 12504, Reprot of Personal Injury, in triplicate, before his tour of duty ends (or as soon as thereafter possible), supplying the information required. All copies are to be sent to the superintendent.

There is insufficient evidence in this case to warrant conclusion that the Claimant was in violation of the Rules cited above. On merits the claim is sustained.

With respect to relief the Board rules as follows. The Claimant last rendered compensated service on this Carrier on the date of March 30, 1994. This is clearly stated in information provided to this Board. The Claimant started to receive disability retirement on September 30, 1994. Thus the Claimant was off work from March 31, 1994 through September 29, 1994. There is no information on whether the Claimant received any compensation, while off work, from the dates of April 21, 1994 through May 20, 1994, which fell between the time-frame cited in the immediate foregoing. If, in fact, the Claimant served the April/May suspension and did not receive any compensation from the Carrier or from any other source between these two dates, this Award mandates that the Clamant shall be paid for all time lost, at the rate then applicable, because of the suspension assessed by the Carrier on the date of April 19, 1994. If the Claimant was receiving some compensation, however, in the form of sick leave, other compensation available under the labor Agreement, or under unemployment comp, or compensation from any other source because of his injuries during the period of April 21, 1994 through May 20, 1994 such shall be deducted, in implementing this Award, from any compensation which the Claimant may have lost because of the suspension he received.

The parties shall do a joint search of the record in order to determine what the situation

here might be and then implement this Award accordingly. In either case, all information

related to the suspension shall be removed from the Claimant's file if the file continues to

exist in the Carrier's records.

## Award

The claim is sustained in accordance with the Findings. This Award shall be
implemented within thirty (30) days of its date.

_____
Edward L. Suntrup, Neutral Member

_____
Thomas M. Rohling, Carrier Member

_____
Roy C. Robinson, Employee Member

Date: _October 10, 2001_

# Tab 6-7

*Burlington Northern and Santa Fe Railway Company and United Transportation Union*, Public Law Board No. 6681

AWARD NO. 5
CASE NO. 5
CARRIER FILE: 60-01-~~0098~~ 0998
ORGANIZATION FILE: 1188-93-RY

PARTIES     BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY
TO                                        and
DISPUTE                 UNITED TRANSPORTATION UNION

## STATEMENT OF CLAIM

Appeal is now being made on behalf of Yardman M. L. McKay for exoneration of all charges regarding the incident of April 6, 2001, reinstatement with all seniority, other prior rights and privileges restored, and pay for all time lost; which includes health and welfare benefits deprived of, if any, during the period of time dismissed.

## FINDINGS AND OPINION

The Board after hearing upon the whole record and all the evidence, finds that the parties herein are the Carrier and Employee, respectively, within the meaning of the Railway Labor Act, as amended; that this Board is duly constituted under Public Law 89-456 and has jurisdiction over the parties and dispute involved herein; and that the parties were given due notice of the hearing thereon.

On October 28, 2004, the Board issued an interim decision which is restated hereinbelow to include a brief summary of the parties' respective positions.

Claimant was assigned as engine foreman on yard job Y-OKC0303 on April 6, 2001. Later that day, the Terminal Manager was advised that the Claimant's train and another train, yard job Y-OKC0302, were involved in a collision on Track 1202 in the Flynn Yard at Oklahoma City, Oklahoma. Two crew members working yard job Y-OKC0302 were injured as a result of this collision. A preliminary investigation of this incident revealed that the Claimant's train had been shoving a cut of cars into the north end of Track 1202, while the other yard job was simultaneously shoving a cut of cars into the south of the same track. Although the engine foreman was protecting the shove on yard job Y-OKC0302, the Claimant, as engine foreman on yard job Y-OKC0303, did not have a crew member protecting the point of his train's shove. Consequently, the Claimant and his crew did not see yard job Y-OKC0302 and collided with that train as each crew shoved cuts of cars backward. Neither crew on the two yard jobs, when given a job briefing by the Assistant Trainmaster, were informed that they would be working on Track 1212 at the same time. Nevertheless, the Claimant was the target of a formal investigation, the results of which culminated in his dismissal from service on June 25, 2001.[1] Nearly a year later, the Carrier reinstated the Claimant to

---

[1]    Claimant's dismissal was predicated upon a variety of Operating Rule violations, viz., 1.1.2; (Alert and Attentive); 1.6 (Conduct); 6.5 (Handling Cars Ahead of Engine; 7.1 (Switching Safely and Efficiently); and 7.2 (Communication Between Crews Switching). Among these rules the Carrier considered most significant here was Operating Rule 6.5, which states:

service, thus reducing his dismissal to a Level "S" 354 day suspension and placing him on a three-year probationary period retroactive to June 25, 2001.

The Carrier submits that its decision to hold the Claimant accountable in this incident is supported by the fact that he improperly chose not to take an easily seen position on the point of the shove in order to protect the shoving movement and that he also failed to observe the point from the ground while the shove was taking place. The Carrier maintains that the Claimant subsequently violated a host of Operating Rules because he simply ignored the shoving movement. Insofar as the Carrier is concerned, the Claimant's failure to accept responsibility in this instance cannot be mitigated on grounds that the Assistant Trainmaster did not inform him that another crew was working at the other end of the track. Conversely, the Organization contends that the Claimant should be absolved of any blame because of the Assistant Trainmaster's failure to brief him that he had given another crew permission to enter the west end of the same track to also shove a cut of cars in his train's direction. The Organization asserts that neither crew occupying that track was aware of this situation. From the Organization's perspective, the Carrier should have held the Assistant Trainmaster solely accountable for the collision and resultant injuries that occurred instead of placing blame on the Claimant to justify his dismissal from service.

After thoroughly reviewing the incident in question, the Board finds the Assistant Trainmaster derelict in failing to inform the crews on yard jobs Y-OKC0303 and Y-OKC0302 that they would be working at opposite ends of the same track simultaneously shoving cars backward unknowingly toward each other's train. However, to some degree the Claimant was at fault because, unlike the engine foreman on the other yard job, he failed to adequately protect the point of the shove with respect to his train. On this point, see Award No. 7 of this Board. Arguably, had he done so, the collision with yard job Y-OKC0302 may have been averted. In light of the circumstances of this case, the Board finds the Claimant's dismissal from service, including the reduction of this penalty upon his reinstatement to a suspension of 354 days and a three-year probationary period, excessive discipline when considering the limited extent of his culpability and good work record. Accordingly, the Claimant's suspension will be further modified to a suspension of thirty days and a one-year probationary period, retroactive to June 25, 2001. He will be entitled to pay for time lost in excess of the thirty-day suspension, subject to all appropriate offsets.

When cars or engines are shoved and conditions require, a crew member must take an easily seen position on the leading car or engine, or be ahead of the movement, to provide protection. Cars or engines must not be shoved to block other tracks until it is safe to do so.

## AWARD

In affirming the interim ruling of October 28, 2004, the claim is partially sustained.

## ORDER

The Carrier shall comply with this Award within thirty (30) days from the date hereof.

 

Charles P. Fischbach
Chairman and Neutral Member

 

Gene L. Shire, Carrier Member           Jim A. Huston, Employee Member

Dated at Chicago, Illinois,
this 6th day of December, 2004

# Tab 6-8

*Burlington Northern Santa Fe Railway Company and United Transportation Union*, Public Law Board No. 6721

PUBLIC LAW BOARD NO. 6721

**BURLINGTON NORTHERN SANTA FE
RAILWAY COMPANY**

NMB Case No. 18
Claim of R. D. Doyno
Dismissal: Absenteeism,
Abuse of FMLA, Conflict
Interest, Failure to
Provide Requested
Information

and

**UNITED TRANSPORTATION UNION**

**STATEMENT OF CLAIM:** Claim on behalf of Southern California Division Yardman R. D. Doyno for reinstatement to service on the BNSF Railway Company with seniority and all other rights unimpaired with pay for all time lost including payment of Health and Welfare Benefits beginning November 25, 2003 and continuing until returned to service and no deductions for outside earnings and the removal of his alleged violations of Rules 1.6, 1.18 of the General Code of Operating Rules, fourth edition, effective April 2, 2000, as supplemented or amended and possibly using Family Medical Leave Act (FMLA) as a reason to lay off working as a Longshoreman.

**FINDINGS OF THE BOARD:** The Board finds that the Carrier and Organization are, respectively, Carrier and Organization, and Claimant an employee within the meaning of the Railway Labor Act, as amended, that this Board is duly constituted and has jurisdiction over the parties, claim and subject matter herein, and that the parties were given due notice of the hearing which was held on March 10, 2006, at Washington, D.C. Claimant was not present at the hearing. The Board makes the following additional findings:

The Carrier and Organization are Parties to a collective bargaining agreement which has been in effect at all times relevant to this dispute, covering the Carrier's employees in the Trainman and Yardman crafts.

Claimant was first employed by the Carrier beginning in March of 1996. Insofar as the record indicates, his service was satisfactory until the events which led to his dismissal. At times relevant to this dispute, Claimant was assigned to a yard job, working days, Monday through Friday.

In October of 2002, Claimant's Wife underwent surgery. The surgery was not completely successful; and she experienced continued pain which limited her ability to care for herself. In November of 2002, Claimant applied for and was granted Family Medical Leave to care for her. He was off from his scheduled assignment a sufficient amount of time that he used up his unpaid FMLA leave by June of 2003.

Claimant continued to be absent after the expiration of his FMLA leave to the point where he was scheduled for investigations in consequence of his excessive absenteeism. Claimant advised Management that his absences were in consequence of his Wife's continued medical problems; and the Carrier canceled the investigations, apparently treating his absences as excused.

Managers claimed that they orally requested documentation for Claimant's Wife's condition, but never insisted on the documentation as a condition of canceling the investigations and never reduced the requests to writing or threatened Claimant with discipline if he failed to comply with the requests. When Claimant's excessive absenteeism continued into the fall of 2003, the Carrier notified him of his unsatisfactory attendance and referred him for alternative handling.

In the summer of 2003, Management had "heard rumors" that Claimant was working as a Longshoreman while marked off. Management interviewed Claimant on November 17, 2003 concerning his possible outside employment. Claimant admitted working as a Longshoreman, and acknowledged that he was trying to work enough for BNSF to retain his benefits while establishing seniority as a Longshoreman, but denied at that time that he had worked as a Longshoreman during times he was on FMLA leave. Claimant was suspended from service, pending investigation, in November of 2003.

The record establishes that Claimant missed 140 days of work for BNSF in 2003 through the time he was removed from service. Sixty days of Claimant's absences were intermittent FMLA, 14 were vacation and 5 were Union business. He also took sick leave. The remainder of the absences were treated as excused until Management started applying the Attendance Guidelines to his attendance.

The Carrier convened an investigation on January 6, 2004 to determine whether Claimant violated General Code of Operating Rules 1.1, (April 2, 2000 Edition) Rules 1.8, which provides that "[e]mployees must not engage in another business or occupation that would create a conflict of interest with their employment on the railroad or would interfere with their availability for service or the proper performance of their duties" and Section 1.6 of which, in part, makes "any act" of misconduct or willful disregard affecting the interest of the Company to be cause for dismissal, as well as possibly using Family Medical Leave Act (FMLA) to cover his absences while working as a Longshoreman.

At the hearing the evidence described herein was adduced. In the hearing, Carrier witnesses admitted that they lacked written

documentation that Claimant had worked as a Longshoreman on days he was scheduled to work for BNSF. Claimant denied that the Carrier had ever asked him for documentation of his Wife's illness, but pointed out that his certification for FMLA leave was conditioned on his submission, and Carrier review and approval, of documentation of her medical condition as making him eligible for such leave. Claimant admitted that there were some times in which he worked as a Longshoreman on days he was off on FML but asserted that he only worked in that capacity after he had tended to his Wife's medical needs, which he testified consisted primarily of providing her personal assistance when her pain limited her ability to care for herself.

Claimant was found guilty of the charges brought against him. He was dismissed from service by a letter dated and sent to him on February 4, 2004, 29 days after the investigation, which he received on February 6, 2004, 31 days after the investigation.

The instant claim for Claimant's reinstatement and payment for all time lost was presented in due course and progressed on the property in the usual manner, but without resolution; and it was submitted to this Board for disposition.

**POSITIONS OF THE PARTIES: The Carrier** argues that it proved, by substantial credible evidence, that Claimant abused FMLA, was insubordinate when he failed to provide documentation of his wife's medical condition as requested, and he engaged in unauthorized employment in conflict with his obligations to BNSF.

The Carrier points out that, after Claimant exhausted his FMLA leave and continued to be excessively absent, he escaped discipline for absenteeism by asserting that he continued to need time off to provide constant care for his wife but failed to provide documentation for her medical condition, despite Management's repeated requests to do so.

The Carrier also argues that Claimant violated his duty of loyalty when he absented himself from his regular assignment to work as a Longshoreman, working for employers who worked with competing railroads in addition to BNSF.

The Carrier argues that Claimant abused his FMLA leave by taking such leave when his Wife did not require constant care and when he used time he was on FMLA to engage in outside employment as a Longshoreman.

The Carrier argues that the evidence proves that Claimant was insubordinate and dishonest. It urges that his dismissal be upheld and that the claim be denied.

**The Organization** argues that the Carrier failed to prove the charges against Claimant and argues further that it failed to provide the Claimant with notice of his dismissal within the contractually-required 30 days.

The Organization argues that the Carrier failed to undertake an investigation within the required 30 days from the date of the occurrence to be investigated. It cites Article 24 (a). The Organization asserts that the Carrier was aware of Claimant's outside employment on or before November 17th, but did not convene the investigation until January 6th.

The Organization also complains that by supporting its charges, Claimant was deprived of his right to face his accusers.

As to the merits of the charges, the Organization maintains that the Carrier failed to prove that Claimant engaged in unauthorized outside employment, since it submitted no evidence that he worked elsewhere when he was supposed to be working for the railroad. It asserts that there was no documentation to establish that Claimant was working as a Longshoreman on any day when he laid off FMLA.

As to Claimant's alleged dishonesty, the Organization argues that Claimant admitted when asked that he had been working as a Longshoreman and conceded that he was trying to keep his benefits with BNSF while establishing a seniority date as a Longshoreman.

As to the charge of abusing FMLA leave, it maintains that the Carrier produced no proof of such abuse. It protests use of Claimant's crew movement history and attendance as beyond the scope of the notice.

The Organization also challenges the Carrier's charge that Claimant failed to produce documentation of his Wife's illness upon request. It points out that the Carrier produced no proof that it requested such documentation, despite a practice of maintaining written documentation.

Finally, the Organization protests Claimant's suspension pending investigation. It asserts that Article 24 (a) limits such suspensions to "aggravated cases, such as a serious collision", which it maintains Claimant's situation is not.

The Organization argues that the claim must be sustained, Claimant's dismissal overturned and that he be reinstated to service with seniority unimpaired and made whole for wages and benefits lost.

**DISCUSSION AND ANALYSIS:** It was the burden of the Carrier to adduce substantial credible evidence on the record as a whole of Claimant's guilt and to establish that the penalty of dismissal was the appropriate response. For the reasons which follow, the Board is persuaded that the Carrier violated its contractual obligations with respect to the timely processing of the charges, which requires that the claim be sustained in accordance with its terms.

As to the Organization's complaint that Claimant did not receive notice of his dismissal within the contractually-required 30 days, the Board is not persuaded. The industry generally follows the "mailbox rule", pursuant to which notices are deemed to have been given on the date they are transmitted. No contrary language or intent with respect to the governing Agreement is contained in the record. The evidence is that the notice of dismissal was mailed to Claimant on the 29th day, within the required 30 days. The Board concludes that the Carrier did not violate the required notice period and that the discipline is not procedurally defective.

The Agreement obligates the Carrier to bring charges within 30 days of when it becomes aware of the charges. [Article 24 (a)]. Failures to comply with time limits are deemed to settle the claim on the terms set forth therein [See Article 24 (d)(6)].

The evidence establishes that the Carrier was aware of Claimant's alleged failures to provide documentation and alleged insubordination on an ongoing basis beginning not later than July or August of 2003, after it allegedly requested that documentation, but did not initiate an investigation until January. The Board notes that the alleged failures to provide documentation are unsupported by proof that his alleged failures to comply rose to the level of insubordination. The Board also notes Claimant's denial that the Carrier ever asked him for documentation.

The evidence also persuades the Board that Carrier had definite knowledge as of November 17th, in the form of Claimant's admission, of his work as a Longshoreman, but held no investigation until January 6, 2004.

It is not clear when, if ever, the Carrier had knowledge of Claimant's alleged FMLA abuse prior to convening an investigation; but to the extent that its notice is based on learning that

Claimant had been engaging in outside employment, that occurred not later than November 17th, and the Carrier's investigation of FMLA abuse suffers from the same infirmities as its other charges.

The Board concludes that the investigation was, therefore, untimely under Article 24 (a) and that, under Article 24 (d) (6), the dispute should be settled on the terms of the claim, that is, with Claimant's reinstatement and restoration of wages and benefits lost.

The Board is also persuaded that the Carrier improperly suspended Claimant pending investigation. Suspension in advance of charges and hearing is proper only in "aggravated cases", which this is not. Indeed, the claimed dishonesty which might otherwise trigger suspension is not proven.

Given the procedural violations which occurred and the manner in which the Parties have by agreement determined to resolve such violations, it is unnecessary to rely on the merits of the charges against Claimant. As indicated, there is insufficient proof to establish that Claimant was insubordinate and insufficient evidence to prove that Claimant's work as a Longshoreman was, itself, impermissible.

The railroad is entitled to prohibit employees from engaging in outside employment which interferes with their ability to perform their railroad duties; but there is insufficient proof that Claimant's occasional work as a Longshoreman was the cause, or a cause, of his absences.

The Board believes that an employee who takes FMLA leave is granted permission to be absent from work to tend to covered medical obligations and not to use such leave to engage in outside employment. If Claimant became sufficiently free of his medical obligations to work, or to seek work, as a Longshoreman, he had an obligation to ascertain if the railroad had work for him. There is no indication that he made any attempt to do so. However, the procedural violations obviate the need to assess the consequences of his failures.

Claimant's large number of absences and his interim earnings are relevant to the remedy, as the Board concludes that the Carrier is entitled to reduce back pay by a projection of his pattern absences and by his outside earnings during the period he was dismissed. The Award so reflects.

**AWARD:** The claim is sustained. The Carrier failed timely to conduct its investigation with respect to the conduct at issue and improperly suspended Claimant pending the investigation. As required by Article 24 (a) of the governing Agreement, the claim is deemed settled in accordance with its terms. Claimant's dismissal shall be rescinded and he shall be reinstated to service, with seniority unimpaired, and made whole for wages and benefits lost for the period he was absent, reduced by a percentage representing the number of workdays he was absent compared to the number of work days scheduled during the last 12 months prior to his suspension and further reduced by his interim earnings, including earnings from working as a Longshoreman during the period he was absent. Claimant shall, as a condition of receipt of back pay and benefits, supply tax and earnings information sufficient to allow the Carrier to calculate outside earnings. The Carrier shall implement the Award within 30 calendar days of its execution.

Executed this 13th day of July, 2006.

M. David Vaughn, Neutral Member

Gene L. Shire, Carrier Member

R. L. Marceau, Employee Member