# EXHIBIT E

EMPLOYEE'S EX PARTE SUBMISSION

to the

NATIONAL RAILROAD ADJUSTMENT BOARD

FIRST DIVISION

CASE NO. NRAB-00001-130404

BROTHERHOOD OF LOCOMOTIVE ENGINEERS & TRAINMEN – BNSF/MRL

GENERAL COMMITTEE OF ADJUSTMENT

-vs-

BNSF RAILWAY

## STATEMENT OF CLAIM:

"It is hereby requested that Engineer A.W. Smith's discipline be reversed with seniority unimpaired. Requesting pay for all time lost, without deduction of outside earnings, including the day(s) for investigation, with restoration of full benefits and that the notation dismissal, be removed from his personal record, resulting from investigation held on May 22, 2012."

## STATEMENT OF FACTS:

The BNSF Railway employed the Claimant in this case, A W. Smith, as an engineer on September 19, 1988. The Claimant has been in the employ of the Carrier working within and around the greater Chicago, Illinois, area for over a quarter of a century. On June 2, 2011, the Claimant was operating a train in commuter service near Aurora, Illinois, operating on the Chicago Subdivision. The Claimant was the only employee in the cab at the time of the alleged

1

incident. The Claimant was operating in Centralized Traffic Control Block System Territory also known as CTC. CTC territory is defined as a block system that uses block signal indications to authorize train movements. The train crew receives its authority to proceed from signal indications. On the date of the alleged incident the Claimant was operating his train in a westerly direction heading toward the Transportation Center. As the Claimant was approaching the signal at West Eola he made an emergency application of the train's brakes when the signal indication he observed was not the indication he had been expecting. The Claimant contacted the dispatcher and awaited further instructions.

On June 6, 2011 the Claimant was placed under charge for his alleged:

> *"... Failure to stop before a signal displaying stop indication and allegedly passing a signal displaying stop indication approximately 90 feet at the West Eola control point at MP 35.2 on the Chicago Subdivision on June 2, 2011 at approximately 17:27 hours while assigned as a crew member on A12121-02S, on duty June 2, 2011 at 04:40 hours at Aurora, Illinois Hill yard and operating train A12471-02S".*

The investigation was subsequently postponed and scheduled to be held on March 22, 2012. The Claimant and his crew members arrived as instructed at the proper location prepared to go forward with the investigation. Carrier Representatives did not appear at the investigation as scheduled that day, so after waiting around for 45 minutes or so, and making attempts to contact Carrier Officers, to no avail, the Claimant, his fellow crew members and their representatives exited the location and returned to their homes.

The record indicates that the Carrier did absolutely nothing after their no-show for a period of 57 days which equates to just over eight weeks. Finally, on May 18, 2012 the Carrier chose to issue another investigation notice instructing all the principals to attend a "make-up" investigation on May 22, 2012. The Claimant and his representative complied with the Carrier's instruction and

attended the make-up investigation on May 22, 2012. (**Charging Letter and Postponements appended as BLET Exhibit A**).

Following the Investigation, a letter dated June 6, 2012, notified the Claimant that:

> *"As a result of investigation held on May 22, 2012 at 0900 hours at BNSF Railway Company Chicago General Conference Room, 233 North Broadway, Aurora, IL, 60504 you are hereby dismissed effective immediately from employment with the BNSF Railway Company for failure to stop before a signal displaying stop indication and allegedly passing a signal displaying stop indication approximately 90 feet at the West Eola control point at MP 35.2 on the Chicago Subdivision on June 2, 2011 at approximately 17:27 hours while assigned as a crew member on A12121-02S, on duty June 2, 2011 at 04:40 hours at Aurora, Illinois Hill yard and operating train A12471-02S"* (**Discipline Letter appended as BLET Exhibit B**).

An appeal of the matter was undertaken by the Organization on the Claimant's behalf and has progressed up to and including the Carrier's highest designated officer, including discussion in conference, without resolution. The Case is now properly before this Board for final adjudication. Copies of the correspondence reflecting the handling of this matter on the property are attached as **On Property Handling appended as BLET Exhibit C**. The transcript of the formal investigation should be furnished by the Carrier as part of their burden of proof in disciplinary matters.

The discipline rules applicable to this dispute are attached as **BLET Exhibit D**.

## POSITION OF ORGANIZATION:

The Carrier has failed to provide the Claimant with a fair and impartial hearing. The Claimants' rights as guaranteed under collective bargaining agreements and due process went unrecognized.

3

The Carrier has also disciplined the Claimant excessively. Further, we believe that the Carrier has failed to fulfill the burden of proof necessary to support its decision.

**PROCEDURAL ARGUMENT:**

The Claimant did not receive a fair and impartial investigation. The Carrier has committed numerous fatal flaws in their handling of the case at hand.

The Claimant's representative, Local Chairman Walker, objected to the Carrier holding the investigation on May 22, 2012. The Local Chairman voiced this objection because the Claimant and he had already attended an investigation for the charges in the June 6, 2011 investigation notice. The Claimant and his representative attended the investigation when the Carrier had scheduled it; on March 22, 2012 at 0900 hours (Transcript page 15, lines 9-18). Unfortunately, the Carrier did not take the time to attend the investigation. It is clear in the transcript of the investigation that the Carrier's Conducting Officer did not attend the investigation as scheduled. After a lengthy wait at the location the investigation was noticed to be held at, the Local Chairman attempted to contact the Carriers deemed representative by telephone and also sent a fax. The facsimile transmission sent by the Local Chairman, Anthony Walker, read as follows:

> "To Whom it may concern:"
>
> "BLET 32 and A. W. Smith was present at BNSF Railway Company Chicago General Conference Room, 685 McClure road, Aurora at 0900 hrs. March 22, 2012. BLET 32 and A. W. Smith was ready to proceed. The Carrier failed to show" (Transcript Exhibit 6).

The above statement was signed by both Local Chairman Walker and the Claimant at 0935 hours and subsequently faxed to the officer's fax number of record.

4

Exhibit 6 evinces that the Local Chairman and the Claimant showed up for the investigation, that no Carrier Officers attended the investigation and that the Claimant waited well over three quarters of an hour for any Carrier Officer to attend. In addition to this Organization's faxed statement, the UTU local chairman who represented three of the other train crew members in attendance at the investigation also sent a fax advising they too were in attendance at the investigation and that no Carrier officer was present (Transcript Exhibit 7). The Organization's multiple attempts to make contact and to get the Carrier Officer to attend the investigation were unsuccessful. The Local Chairman also attempted to contact the Conducting Officer by calling his telephone. He was unsuccessful in these attempts as well.

General Manager Matt Igoe, in his denial letter dated August 21, 2012, to the Local Chairman's appeal letter dated July 16, 2012, admits that the Carrier erred by not attending the investigation. He also admits that the record is clear that union representatives attempted to contact the Conducting Officer by telephone and fax machine. Mr. Igoe stated the following in his denial to Local Chairman Walker's appeal letter:

> "However, the record is clear that union representatives called the conducting officer's office phone and faxed the letter to his office machine..." **(BLET Exhibit C).**

The Organization appreciates General Manager Matt Igoe's concurrence that attempts to contact a Carrier Officer were made and his admission that no Carrier Officer attended the investigation as required on March 22, 2012. We also appreciate his apology for that absence in his letter. However, the reality is that the Carrier cannot simply pardon their absence at the investigation by apologizing and attempting to explain away how they made an error. Quite simply put, the Carrier missed the party. The lights were out and nobody was there to dance. The Carrier dropped the ball. Many times over the years charged employees have expressed regret for errors they've made

but they have most certainly been held responsible for whatever incident the Carrier had them under charge for. While the Carrier seems quite comfortable explaining away and excusing their absence they don't appear to take any interest in extending the same courtesy to the Claimant. The lack of attendance at the investigation was a fatal flaw for the Carrier and all charges should have been dropped.

After their no-show at the investigation, the Carrier waited for over a two month period (8 weeks and a day to be exact) then attempted to resurrect the incident and recharge the Claimant by issuing a new investigation notice dated May 18, 2012. The notice states that the investigation has now been rescheduled; *"Through mutual agreement of BNSF and Union Representation"* (Transcript Exhibit 8A). This statement is nothing but a misleading notion on the Carrier's part. **It is undisputed in the record that after the Carrier's faux pas, neither of the principal's representing Organization's agreed to a postponement.**

Both of the charged principal's representatives, the BLET Local Chairman and the two UTU Local Chairmen, objected to the holding of another investigation on May 22, 2012 (Transcript page 64, lines 1-16, Transcript page 66, lines 3-10 and Transcript page 21, lines 19-26). Each of the principal's representatives testified that after attending the prior no-show investigation, they requested no postponements, they received no requests for postponement from the Carrier, nor did they agree to any postponements.

Testimony in multiple locations in the transcript gives credence to the fact that after the no-show investigation of March 22, 2011 the Carrier did not request any further postponements. Local Chairman Anthony W. Walker asked one of the principles the following question:

> "Uh, Brad, did the Carrier contact you and request a postponement on the day that you were at Aurora?"

6

The principle, Brad G. Kobliska a trainman on the Claimant's crew replied succinctly:

"No" (Transcript page 60, lines 24-26 and page 61, line 1).

Later in the transcript, UTU Local Chairman Robert W. Mitchell asked another crew member, trainman Stephen K. Smethurst this question:

"Were you given a prior notice to 0900 hours, March 22, that this investigation that you had attended at 685 McClure Road, that that investigation was postponed? Were you given notice prior to being there that day?"

Principal Smethurst also replied in the negative stating:

"No" (Transcript page 64, lines 11-16).

More corroboration of the lack of concurrence between the Claimant's representatives and the Carrier can be found in the transcript testimony from UTU Local Chairman Robert W Mitchell. Related to the lack of a mutual agreement of postponement Mr. Mitchell stated the following:

"First the notice states, through mutual agreement of BNSF and U – Union Representative, investigation below has been postponed. **This is false.** The Organization has never agreed to this postponement" (Emphasis ours) (Transcript page 85, lines 14-18).

Finally there is the testimony taken directly from the transcript which leaves no doubt in anyone's mind as to how Mr. Walker, the Claimant's representative, felt about the Conducting Officer's statement that he had agreed to a postponement:

Timothy Merriweather: "Okay, Mr. Walker, you did here in, on the May 18, 2012, notice, that there was a mutual agreement between BNSF and union representative to reschedule investigation?"

7

| Anthony W Walker: | "On postponement notice number two, correct." |
| --- | --- |
| Timothy Merriweather: | "On postponement notice number 3." |
| Anthony W Walker: | "No, I did not concur to number 3." (Transcript page 21, lines 1-5) |

At this juncture the Conducting Officer attempts to make the point for the record that the representative wouldn't have known about the investigation had he not agreed to a postponement. The local chairman will hear none of that nonsense however and the following conversation in the record clarifies any doubt this Board may have as to how the local chairman just happened to attend the make-up investigation:

| Timothy Merriweather: | "How, how can it be here, how can we be here today if you..." |
| --- | --- |
| Anthony W Walker: | "We are, the only reason we're here is we're complying with the notice." |
| Timothy Merriweather: | "Okay." |
| Anthony W Walker: | "Not to be insubordinate. Furthermore, it states on the notice that through mutual agreement the BNSF and the union representative at the investigation below has postponed until 0900 hrs. **Well that's a flat a-, out lie.** You didn't contact anybody to be in mutual agreement." (Emphasis ours) (Transcript page 21, lines 19-23) |

The Local Chairman's assertive testimony and the other related testimony in the record of the investigation clearly demonstrates there was no mutual agreement to postpone after the Carriers no-show at the March 22, 2012 investigation. Absent the much delayed and improper final investigation notice there is nothing in the record that shows the Carrier even bothered to request a postponement after their no-show.

At the May 22, 2012, re-do, in a lame attempt to offset the vehement objections of Local Chairman Walker to holding the investigation, the Conducting Officer, Mr. Merriweather attempted to deceive and fabricate evidence of acquiescence by introducing an exhibit of an email (Transcript page 22, lines 15-26 and page 23, lines 1-4). The Conducting Officer, now deciding to change hats and make himself a witness at the investigation, gives testimony that he emailed the Claimant's Local Chairman asking him to pick between two dates (Transcript Exhibit#10). Local Chairman Walker, now aware that the Carrier was intending to improperly hold the investigation after their no-show, chose to be respectful and to reply to the Carriers email. Since he had a prior engagement on May 23, Local Chairman Walker replied to the email simply stating that May 22 would work. Testimony in the record by the Local Chairman following Company Officer Merriweather's attempt to deceive leaves no doubt as to what that email was about:

> "...that email has nothing to do, it's not requesting a postponement. That was the point of the Exhibit I just handed you. You're supposed to concur... " (Transcript page 23, lines 6-7).

The Organization would like to point out that the Carrier is attempting to imply there was a concurrence for a postponement of an investigation that already occurred some two months earlier. The Carrier would have us believe that the email sent May 17, 2012 to Local Chairman Anthony Walker is an agreement to postpone the investigation of March 22, 2012. I guess you could say, using railroad terminology, the train left the station two months ago but it just this moment was issued a signal to proceed.

Furthermore, the email the Conducting Officer introduced as Exhibit 10 is quite clearly not a request for a postponement. Mr. Merriwether's email states the following:

> "I would like to convene the two A.W. Smith investigations either next Tuesday May 22 or Wednesday May 23. I have checked everyone's vacation and PLD days and everyone is available. Are either of these days good for you?" (Transcript

Exhibit #10).

Local Chairman Walker's reply to the email also has no references to any form of postponement. Mr. Walker simply replies:

"22nd will work I have an appointment on the 23rd".

There was no request for postponement from the Carrier and there was no agreement to do so by the Claimant's Representative related to the email entered into the transcript as Exhibit 10 by the Conducting Officer. It is disingenuous of the Conducting Officer to even attempt to infer such.

Following the discussion with the Conducting Officer related to the email, supra, the Local Chairman then attempts to introduce an exhibit (1st Division Award 25263) to support his argument that since they never received a request to postpone the investigation and did not agree to a postponement the Carrier should cancel the investigation (Transcript page 24, lines 9-21). Company Officer Merriweather, now removing his witness hat and donning his Conducting Officer fedora, states he won't allow the document to be made part of the record. After reviewing the applicable finding by the arbitrator in that award it's easy to see why the Conducting Officer would not have wished to allow the Claimant's Representative to introduce First Division Award 25263 into the record of the investigation. The findings in the award are as follows:

> "... **There was no postponement agreed upon by the Claimant or his representative** in this case. Moreover the Carrier violated the rules requiring that a hearing be held within 10 days after the notice of investigation is issued, and the Claimant's discipline must be removed from his personnel file and he shall be made whole" (Emphasis ours) (1st Division Award 25263 attached as **BLET Exhibit E).**

Other arbitrators have also found that the Carrier has the obligation to obtain the concurrence of the Claimant or his representative if they wish to postpone an investigation. In First Division

Award Number 26722, Arbitrator Clauss stated the following in an award sustaining the Organization's position:

> "Here, both parties objected – – citing no agreement to postpone. There is nothing to show that a postponement was agreed to. Further, there is nothing in the record to show that the postponement was requested by the Carrier and unreasonably withheld by the Organization" (First Division Award 26722 attached as **BLET Exhibit F**).

Another award supporting the Organization's position that both parties must agree to a postponement can be found in first division award number 25234, where the Arbitrator, Mr. LaRocco, stated the following:

> "... the board concludes that the record does not contain sufficient evidence showing that the Claimant's local representative concurred with a postponement to August 11 and the Carrier did not demonstrate good cause for the postponement. The Organization and the Claimant were ready to go forward with the investigation on July 30, but the Carrier's primary witness, the manager of operating practices, was suddenly unavailable, evidently due to a dental appointment... In view of the Claimants representatives denials that he agreed to the postponement, **there is nothing in the record demonstrating that the Carrier obtained the Claimants representatives concurrence to a postponement** beyond August 3, 1998" (emphasis ours) (First Division Award Number 25234 attached as **BLET Exhibit G**).

Clearly the record of this investigation does not indicate a concurrence to a postponement of the investigation. In light of the arbitration supporting the Organization's position, the Claimant should not have received discipline for an investigation that should not have been held.

Not only should the investigation have been canceled, but to add insult to injury the investigation the Carrier went forward with was far from fair and impartial. The discipline letter dated June 6,

11

2012, is signed by Timothy Merriweather the Terminal Superintendent of Cicero Illinois. Mr. Merriweather was the party who conducted the investigation. He also was tasked with reviewing the transcript of the investigation and assessing discipline fairly and impartially. The Organization would argue that Mr. Merriweather would be the poorest choice possible to have been given such important tasks.

As discussed supra, the Conducting Officer changed his hats throughout the investigation. Such changes are problematic at an investigation. Testimony shows the Conducting Officer took the liberty of demoting himself to company witness status as he saw fit. One example of the Conducting Officer demoting himself to a company witness in the record reads as follows:

| Anthony W Walker: | "BLET 32, and Mr. A. W. Smith, we were present at, 685 McClure Road, complying with the Carriers notice. However, the Carrier failed to comply with there own notice and didn't show up. I request that this investigation be canceled in its entirety, and Mr. Smith is exonerated of all charges". |
|---|---|
| Timothy Merriweather: | "Mr. Walker, your objection will be duly noted and will be part of the transcript. Um, the Carrier did arrive at the location, 685 McClure Road at 9:45 a.m.". |
| Anthony W Walker: | "Excuse me, the conducting officer's not supposed to be entering stuff for the rec-, transcript". (Transcript page 15, lines 11-22). |

This exchange was in response to the Local Chairman's objection to the Company not attending the previous investigation on March 22, 2012. It must be noted for the record here that the Conducting Officer, Mr. Merriwether, was the no-show at the earlier investigation in March. While the Organization can understand why the Conducting Officer would like to explain his

absence at the previous investigation, it is improper for him to inject testimony into the record. General Manager Matt Igoe used this improper testimony in his denial letter dated August 21, 2012 to the local chairman's appeal of the discipline assessed. The General Manager stated the following in his letter:

> "The Carrier apologizes for the error when listing the incorrect address for the investigation on the postponement notice, **but the officer did showed** [sic] **up,** but they were late" (Emphasis ours) (**BLET Exhibit C**).

We now have the Conducting Officer introducing evidence into the record as a witness and the General Manager denying the Claimant's appeal based on his review of that improper evidence. Such behavior does not give any indication of a fair and impartial investigative process.

It is the duty of the Carrier to conduct a fair and impartial investigation. When the Conducting Officer becomes a witness and then uses his own testimony as the issuer of discipline the Claimant most certainly does not receive due process under the CBA.

Numerous Arbitrators have ruled that the Carrier must make every effort to avoid allowing Carrier officers to serve multiple roles in the disciplinary process. In relation to the combining of the roles of company witness and assessor of discipline, Arbitrator Simon states the following in First Division Award No. 26454:

> "One of the functions of the Carrier official charged with issuing discipline is to assess the credibility of the witness at the investigation. The importance of that function cannot be stressed too much because, as we often note, this board generally gives deference to such credibility determinations. In the instant case, Corzine was in a position that required him to weigh the credibility of his own testimony against that of Claimant. It would be folly to believe he could do that in a fair and impartial manner. The serving in these two capacities is a per se violation of due process. The discipline, therefore, must be reversed" (First Division Award No. 26454 attached as **BLET Exhibit H**).

In this case before the Board the Carrier most certainly did not make an effort to avoid combining the tasks of witness and disciplinarian. In actuality, after the close of the investigation, the Carrier encouraged such behavior by allowing the Conducting Officer to change his attire from that of a witness for the prosecution, to the robe of a judge to the clothing of a juror. This same Conducting Officer, who was most certainly embarrassed by his gaffe related to not attending the originally scheduled investigation, was initially the contact designee prior to the investigation, the judge at the investigation and then he became the jury. As such, his decision would have been prejudiced by discussions and conversations held prior to the investigation and his own testimony as a witness at the investigation. Mr. Merriweather should have been the last person chosen to make a decision as to whether to assess discipline in this matter.

Numerous Tribunals have ruled that if the Carrier chooses to have a Company Officer perform more than one function as part of the investigative process; such behavior must be beyond reproach. While many arbitral panels have recognized that assuming multiple roles, *per se*, is not a denial of due process as long as the hearing officer's conduct is beyond reproach during the hearing as well as during any other involvement with the case, we submit that the Carrier's behavior in this case was clearly not beyond reproach. In light of Mr. Merriwether's multiple roles in the overall process we submit that the Claimant did not receive a fair and impartial investigation.

First Division Award No. 26337 involved a similar case of multiple roles by a Carrier Officer. In that award Neutral Eishen stated:

> "In the considered judgment of this Board, however, the multiple-role objection is firmly grounded in the factual record and proves fatal to Carrier's decision to discharge this Claimant. It simply is incompatible with Rule 50's guarantee of a fair and impartial Investigation to allow the same individual who filed the charges against the Claimant to **conduct the hearing and develop evidence supporting**

14

> his own charges, to pass judgment whether the hearing he conducted was fair
> and proper (including his refusal to call requested witnesses), to determine
> whether the evidence in the record of the hearing he conducted was adequate
> to prove the charges which he had filed and finally to impose the penalty."
> (Emphasis ours) (First Division Award No. 26337 attached as **BLET Exhibit I**).

We submit the behavior by the Carrier was not beyond reproach in this case. The Claimant did not receive a fair and impartial investigation.

Further evidence of a lack of fairness and impartiality can be found in the General Manager's denial letter dated August 21, 2012, supra, which is replete with unfounded allegations and inferences. While he admits the record is clear related to the Union's attempts to contact the Conducting Officer by phone and by fax, he then goes on to infer that *"they knew he would not be there"*. This attempt to improperly add to the record, in the hope of disputing the actual testimony of record only demonstrates that General Manager Igoe has not been impartial in his review of the record.

General Manager Igoe also attempts to explain why the Carrier missed the investigation they scheduled. His explanations are neither necessary nor a valid portion of the record for consideration. It is undisputed in the record of the investigation that the Local Chairman hand delivered a note to Trainmaster Jeremy Schroeder, to document that the Organization's representatives and the Claimant's were the only parties in attendance at the scheduled investigation on March 22, 2012 (Transcript page 16, lines 12-13). The General Manager endeavors to introduce an argument that the Carrier had no knowledge of a note being hand delivered but the record shows otherwise. The time to introduce this testimony would have been prior to the close of the investigation. That time has gone by, and it is disingenuous for the General Manager to state: *"Further investigation revealed the Carrier has no knowledge of a note being had delivered to Trainmaster Schroeder. Therefore your allegation has no merit"*. That testimony of a note being delivered to the Trainmaster was never questioned or refuted in the

record. That the Carrier would attempt to create these arguments, weak and unfounded as they are, gives clear indications of the predetermination of guilt and the wish to discipline the Claimant the Carrier harbored related to this incident.

The Organization also notes that the record of the investigation was not complete. Transcript pages 95-96 were not included in the record of the investigation and there is no exhibit 28. The Organization requested access to these pages but the Carrier has been unresponsive (**BLET Exhibit C**). It is impossible for the Organization to make all necessary arguments when a complete record has not been made available.

### MERIT ARGUMENT:

Without prejudice to the above procedural arguments, we will address the merits of the charge. The discipline assessed was excessive and unduly harsh. The Claimant has been in the employ of the Carrier for over 25 years. Due credit was not given in the assessment of discipline for those many years of service. Numerous tribunals have ruled that rules or policies that are implemented must not be arbitrary, capricious or harsh.

In First Division Award 24987 (**BLET Exhibit J**), Referee Richter stated the following:

> "It has long been established that the Carrier has the right to implement rules governing the conduct of its employees, so long as such rules are not arbitrary, capricious or unduly harsh. The board finds the action of the Carrier in this case to be unduly harsh. Accordingly the discipline will be reduced..."

Additionally, in First Division Award 24875 (**BLET Exhibit K**), Referee Wesman found that credit must be given based on years of service. The referee in this award stated that:

16

> "There can be no question that Claimant shares responsibility for the accident. Questions raised at the hearing and subsequent correspondence, however, suggest that **in light of his prior record and long years of service with the Carrier**, the ultimate penalty of dismissal is excessively harsh". (Emphasis Ours)

In the case at hand, in light of the Claimant's quarter century of service, the Organization feels that due consideration was not given to the many years of service provided to the Carrier.

This case is the first of two cases before this Board concerning the Claimant. The second case before this board for the Claimant is Case NRAB-00001-130405. In both cases before this board the Carrier assessed the discipline of dismissal to the Claimant. Should a sustaining award be rendered in any or all of these cases, the discipline assessed through the Carrier's PEPA Policy will need to be reviewed and adjustments made, including the possibility of reinstatement.

## **CONCLUSION:**

It is the conclusion of the Organization that the Claimant was denied his right to a fair and impartial investigation, and that the Carrier has not proven its case.

In Davis Fire Brick Co., 36 LA 124, 127 (Dworkin, 1960), (**BLET Exhibit L**), the court ruled:

> "Inherent in the contractual provision that an employee may be disciplined for just cause, is the fairness and reasonableness of the penalty. While the basis for discipline may be clearly established, unless the penalty is reasonably commensurate with the improper conduct of the employee, then "just cause" is wanting as regards the penalty imposed."

As such, the Organization's claim for all time lost with benefits restored is the appropriate remedy. The Board is urged to recognize that the discipline assessed in this case is far from

commensurate with the Claimant's actions and that "just cause" is definitely wanting. As such, the Organization's claim for all time lost with benefits restored is the appropriate remedy. In this regard, we submit that our claim is supported in Rule 63 of the former CB&Q Schedule, (**BLET Exhibit D**) which requires employees working under this CBA who are not proven to be guilty as charged, "... *In case of unjust dismissal or discipline the engineer will be reinstated, paid for time lost and the record corrected...* ".

In the event that the Claimant is returned to service with back pay, it is the position of the Organization that the Carrier is without the right to offset earnings when the Carrier is required to pay a Claimant for time lost as a result of a wrongful suspension or dismissal. The Carrier's position is contrary to our on-property understandings and past practice. There is also a long arbitral history of requiring the payment of all wages lost *without* allowing any deduction for outside earnings, including awards from the First Division. We have shared many of these with the Carrier in the recent past. Please refer to our supplemental submission that was presented to PLB No. 5939. (Organization's Supplemental Submission to Public Law Board No. 5939 attached as **BLET Exhibit M**).

While the Carrier might introduce various Awards and Interpretations involving other crafts and other Carriers where deductions have been allowed, it has not provided any evidence to show that on this property. Absent any affirmative showing that such offsets were contemplated by the Organization's Schedules, it is improper in this craft to allow them, and it is improper herein.

Furthermore, if the Carrier makes any attempt to offset a claim by deducting for outside income earned during the period in question, we may request an interpretation of the Arbitrator's intent of the award. In the unlikely event that such offsets are provided to the Carrier, we may also request compensatory damages in return.

For each of the reasons stated above, we believe an award sustaining our position is in order and

this Board is respectfully requested to so rule.

All information presented herein has been presented to the Carrier during the handling of this dispute on the property.

Respectfully submitted,

*M. O. Wilson* (signature)

M. O. Wilson
General Chairman
Brotherhood of Locomotive Engineers and Trainmen
EGL