# EXHIBIT F

EMPLOYEE'S EX PARTE SUBMISSION

to the

NATIONAL RAILROAD ADJUSTMENT BOARD

FIRST DIVISION

CASE NO. NRAB-00001-130405

BROTHERHOOD OF LOCOMOTIVE ENGINEERS & TRAINMEN – BNSF/MRL

GENERAL COMMITTEE OF ADJUSTMENT

-vs-

BNSF RAILWAY


## STATEMENT OF CLAIM:

"It is hereby requested that Engineer A.W. Smith's discipline be reversed with seniority unimpaired. Requesting pay for all time lost, without deduction of outside earnings, including the day(s) for investigation, with restoration of full benefits and that the notation dismissal, be removed from his personal record, resulting from investigation held on November 7, 2012."

## STATEMENT OF FACTS:

The BNSF Railway employed the Claimant in this case, A.W. Smith, as an engineer on September 19, 1988. The Claimant has been in the employ of the Carrier working within and around the greater Chicago, Illinois, area for over a quarter of a century. On March 13, 2012, the Claimant was operating a train in commuter service near Aurora, Illinois. The Claimant was the only employee in the cab at the time of the alleged incident. The Claimant was operating in

1

Centralized Traffic Control Block System Territory also known as CTC. CTC territory is defined as a block system that uses block signal indications to authorize train movements. The train crew receives its authority to proceed from signal indications. On the date of the alleged incident the Claimant was operating his train at Congress Park. The Carrier alleges that the Claimant failed to stop before a signal displaying a stop indication while heading in a westbound direction on main track one at the Congress Park control point, which was located at milepost 12.4, on the Chicago subdivision.

On March 15, 2012 the Claimant was placed under charge for his alleged:

> *"... Failure to stop before a signal displaying stop indication and allegedly passing a signal displaying stop indication while operating westbound on Main Track One at the Congress Park Control Point, milepost 12.4 on the Chicago Subdivision, alleged failure to call Emergency, Emergency, Emergency upon passing signal displaying stop indication that Congress Park Control Point, and alleged failure to notify Train Dispatcher after passing signal displaying stop indication at Congress Park Control Point, on Tuesday, March 13, 2012 at approximately 18:15 hours while assigned as crew member on A12281-13S".*

The investigation was subsequently postponed and scheduled to be held on November 7, 2012. The Claimant did not receive his investigation notice prior to the closing of the actual investigation. The Carrier chose to hold the investigation for the Claimant in absentia in spite of the Local Chairman's objection at the investigation. **(Charging Letter and Postponements appended as <u>BLET Exhibit A</u>).**

Following the Investigation, a letter dated November 26, 2012, notified the Claimant that:

> *"As a result of investigation held on November 7, 2012 at 1000 hours at BNSF Railway Company Chicago General Conference Room, 233 North Broadway, Aurora, IL, 60504 you are hereby dismissed effective immediately from employment with the BNSF Railway Company for failure to stop before a signal*

*displaying stop indication and allegedly passing a signal displaying stop indication while operating westbound on Main Track One at the Congress Park Control Point, milepost 12.4 on the Chicago Subdivision, failure to call Emergency, Emergency, Emergency upon passing signal displaying stop indication at Congress Park Control Point, and failure to notify Train Dispatcher after passing signal displaying stop indication at Congress Park Control Point, on Tuesday, March 13, 2012 at approximately 18:15 hours while assigned as crew member on A12281-13S"* (**Discipline Letter appended as <u>BLET Exhibit B</u>**).

An appeal of the matter was undertaken by the Organization on the Claimant's behalf and has progressed up to and including the Carrier's highest designated officer, including discussion in conference, without resolution. The Case is now properly before this Board for final adjudication. Copies of the correspondence reflecting the handling of this matter on the property are attached as **On Property Handling appended as <u>BLET Exhibit C</u>**. The transcript of the formal investigation should be furnished by the Carrier as part of their burden of proof in disciplinary matters.

The discipline rules applicable to this dispute are attached as **<u>BLET Exhibit D</u>**.

## POSITION OF ORGANIZATION:

The Carrier has failed to provide the Claimant with a fair and impartial hearing. The Claimants' rights as guaranteed under collective bargaining agreements and due process went unrecognized.

The Carrier has also disciplined the Claimant excessively. Further, we believe that the Carrier has failed to fulfill the burden of proof necessary to support its decision. The Carrier has not proven their case.

3

## PROCEDURAL ARGUMENT:

The Claimant did not receive a fair and impartial investigation. The Carrier has committed numerous fatal flaws in their handling of the case at hand.

The Claimant did not receive a notice to attend the investigation. The investigation was held in absentia. The Post Office did not get notification of the investigation to the Claimant in time for the Claimant to attend the investigation. The BLET Local Chairman entered an objection at the investigation explaining that the Claimant, who was absent, was not aware the investigation was even scheduled. When the Carrier Officer who was conducting the investigation, Mr. Clayton Johansson, stated he had evidence the Claimant had been served his notice and introduced a receipt from the USPS into the record as Exhibit 12, the Local Chairman requested that he be allowed to review the receipt. The Conducting Officer honored this request and the Local Chairman stated the following after he was given an opportunity to review the postal receipt:

> "This says it arrived there, it doesn't say anything about him receiving it. We have no signature for this"

The Conducting Officer in reply states the following:

> "Is that an objection?"

The Local Chairman replied in the affirmative:

> "Yeah" (Transcript page 18, lines 8-12).

The Local Chairman had a legitimate objection at this point. The receipt provided by the Carrier at the investigation simply indicated that the letter mailed by the Carrier had arrived at the postal unit of Westchester, Illinois, not that an attempted delivery had been made. At this point the Carrier should have taken an opportunity to drill down on this detail and found out exactly what

4

"*Arrival at Unit*" meant to the USPS. Instead the Conducting Officer simply chose to ignore the issue and continue with the investigation. While there is testimony in the record indicating the Conducting Officer was aware that three of the principals were absent at the investigation -- one of which was the Claimant --there is no evidence in the record that the Carrier at any time attempted to contact the Claimant or the other missing principals by telephone to ask them if they were aware that the investigation had been re-scheduled. There is an entry in the record of the transcript that shows the Conducting Officer took a seven minute recess to attempt to ascertain the whereabouts of the missing principles, but there is nothing in the record documenting what attempts were made or if the Conducting Officer even left the room where the investigation was being held to look for the Claimant (Transcript page 5, lines 3-6). The Conducting Officer did ask Local Chairman Walker if he had tried to contact the Claimant but Mr. Walker explained he did not have the Claimants phone number in his possession, he had left it at his home (Transcript page 5, lines 22-25). At this juncture the Conducting Officer could, and should, have taken the opportunity to utilize the crew office's records for the Claimant and made an attempt to contact him.

Every employee's personal contact information is available to all Carrier supervisors in an easily accessible format in the Carriers' data storage system. It would not have taken the Conducting Officer but a few moments to pull up this information and make an attempt to reach out to the Claimant. Unfortunately for the Claimant, the Conducting Officer did not perform this small task but chose to continue the investigation over the objection of the Local Chairman. Had the Conducting Officer made just a little bit of effort the Claimant may well have been contacted and been able to attend the investigation.

In his appeal letter, dated December 9, 2012 the Local Chairman was able to explain the Claimant's absence at the investigation. Attached to his appeal to General Manager Matt Igoe, the Local Chairman provided a copy of a letter from the United States Postal Service explaining that the phrase "*Arrival at Unit*" simply meant that the letter had arrived at the Postal Station Unit that

5

would affect the delivery. The letter goes on to state unequivocally that a delivery attempt was not made when the letter arrived at the unit. The USPS Consumer Affairs Representative apologized for the error in the attached documentation which shows that the letter was not received by the Claimant until November 7, 2012 at 3:46 PM which would be over three hours after the investigation was concluded by the Carrier (**BLET Exhibit C**). Since the investigation was concluded prior to the Claimant receiving notification of the investigation the Claimant did not receive the benefit of a fair and impartial investigation under the CBA.

In a letter of reply dated January 18, 2013, to the Local Chairman's letter of appeal the recently appointed replacement for Mr. Igoe, General Manager Jason Jenkins, states that upon his review of the attachments provided by the Local Chairman with his appeal he feels the USPS attempted delivery on November 6, 2012. Then the general manager makes a statement that had the Claimant picked up the letter on the date of November 6, 2012 the Claimant would've had time to attend the investigation on November 7, 2012. Mr. Jenkins argument rings hollow because there is no evidence in the record indicating what time or even what date the letter was actually placed in the Claimant's mailbox. There is no evidence in the record from the USPS that clearly indicates when the first attempt at delivery was. The only specific written documentation related to any attempted delivery of the letter is that the letter was officially delivered on November 7, 2012 at 3:46 pm. Lacking any evidence in the record indicating any attempts to deliver, we are obligated to utilize the facts in the record and those facts clearly show that the Claimant had not received any notice to attend the investigation.

In PLB No. 3882 a similar argument as to notification was heard by Neutral Raymond Cluster. Mr. Cluster's ruling stated the following regarding proper notification of investigation:

> "... the defining requirement is proper notification, and if the issue is raised that the employee did not receive proper notification of the time and place of the investigation, it is the Carrier's burden to prove such notification by appropriate

6

evidence, the most usual form of which is a return receipt or other document signed by the employee indicating his receipt of the notice in question" (PLB No. 3882, Award No. 178 attached as **BLET Exhibit E**).

We submit that in the case at hand the Claimant did not receive the notice prior to the conclusion of the investigation. We also would note that there is no evidence in the record provided to document the Carrier's red herring argument that the Claimant did not check his mail in a timely manner. The Claimant did not receive proper notice to attend and as such the investigation was neither impartial nor fairly conducted.

In a letter dated July 6, 2012 Local Chairman Walker had requested that the Carrier provide him with a copy of the locomotive videotape prior to investigation and that the East End Dispatcher be present at the investigation when it was held (Transcript Exhibit 24, page 1). The Carrier denied this request in a letter dated November 2, 2012 in which they stated the following:

> "... You will be given the opportunity to question all witnesses and review all exhibits at the investigation, as historically done under the discipline rules" (Transcript Exhibit 24, page 2).

The Local Chairman was not given time to properly review documents at the investigation. The Carrier had possession of these requested documents months in advance of the investigation. When the investigation was finally held the Carrier did not honor its promise to provide the Claimant's representative with the video nor did they give the Local Chairman a reasonable amount of time in which to review any documents. When the Claimant's representative requested time to review the documents, the Conducting Officer gave him a paltry 4 minutes in which to review the information.

At the time of the Local Chairman's request the documents he needed to review amounted to over 10 pages of information (Transcript page 23, lines 22-23). The Local Chairman was well within

7

his rights to request time to review the important documentation. This information was of a highly technical nature related to block signals and might as well have been written in a foreign language as none of the employees working in train service generally have any training or knowledge related to the signal systems in the recording of indications and such. In light of the importance of this documentation, provided by the Carrier only at the investigation, the Conducting Officer should have allowed the Claimant's representative a reasonable amount of time to review the documents. Instead, the Conducting Officer recessed the investigation at 11:13 hours and then restarted the investigation at 11:17 hours (Transcript page 24, lines 23-24). The meager four minutes allowed by the Conducting Officer was of little value to the Claimant's representative. The Local Chairman objected, but the Conducting Officer continued on with the investigation (Transcript page 23, lines 25-26 and page 24, lines 1-5). It is disingenuous of the Carrier to deny the Claimant's representative access to the documents in advance of the investigation with the promise of ample time to review at the investigation and then turn around at the actual event and refuse to allow him time to review and gain an understanding of the documents. Such treatment is a strong indication that the Claimant did not receive the benefit of a fair and impartial investigation as was due under his CBA.

The Carrier did not provide witnesses, requested by the Claimant's representative, who had testimony that could have exonerated the Claimant. Prior to the investigation Local Chairman Walker had specifically requested that the dispatcher at the time of the alleged incident be in attendance at the investigation. As mentioned (supra) the Carrier advised the Local Chairman he would have an opportunity at the investigation to question all witnesses. During the investigation when it became apparent to the Claimant's representative that the dispatcher would not be in attendance the Local Chairman voiced an objection (Transcript page 48, lines 2-3). The Local Chairman's objection was overruled by the Conducting Officer, and the dispatcher was not produced. The Local Chairman also voiced objection at the investigation due the fact that one of the principles, the conductor on the train crew, was not in attendance at the investigation (Transcript page 20, lines 26). The Local Chairman felt that the conductor could give testimony

8

that would have possibly exonerated the Claimant of the charges at hand. The Conducting Officer proceeded over the objection of Local Chairman Walker. There was no reason, other than the Conducting Officer's obvious predetermination of the Claimant's guilt, for him not to recess the investigation until all of the principals involved could be present to testify to the actual facts of the case. The investigation was not fair and impartial.

## MERIT ARGUMENT:

Without prejudice to the above procedural arguments, we will address the merits of the charge. The discipline assessed was excessive and unduly harsh. The Claimant has been in the employ of the Carrier for over 25 years. Due credit was not given in the assessment of discipline for those many years of service. Numerous tribunals have ruled that rules or policies that are implemented must not be arbitrary, capricious or harsh.

In First Division Award 24987 **(BLET Exhibit F)**, Referee Richter stated the following:

> "It has long been established that the Carrier has the right to implement rules governing the conduct of its employees, so long as such rules are not arbitrary, capricious or unduly harsh. The board finds the action of the Carrier in this case to be unduly harsh. Accordingly the discipline will be reduced..."

Additionally, in First Division Award 24875 **(BLET Exhibit G)**, Referee Wesman found that credit must be given based on years of service. The referee in this award stated that:

> "There can be no question that Claimant shares responsibility for the accident. Questions raised at the hearing and subsequent correspondence, however, suggest that **in light of his prior record and long years of service with the Carrier**, the ultimate penalty of dismissal is excessively harsh". (Emphasis Ours)

9

In the case at hand, in light of the Claimant's quarter century of service, the Organization feels that due consideration was not given to the many years of service provided to the Carrier.

The charges were not proven. The Carrier introduced a video and the Conducting Officer allowed testimony from Company Witness Chris Motley stating that based on the video he was watching the Claimant went past a red block. The quality of the video was terrible. The Claimants representative objected to the playing of the video due to the poor quality and the lack of clarity it was displaying, and he stated the following in response to the testimony of Carrier Witness Christopher Motley:

> "I didn't see any red signals" (Transcript page 30, line 20).

Shortly after the Claimants representative stated that he couldn't see any red signals in the video the Carrier was displaying, the Local Chairman voiced another objection attempting to describe in brief the challenges he saw with the video. Local Chairman Walker stated the following:

> "Uh, the video is inconclusive at best. You can't see any of the signals. It should not be used as evidence" (Transcript page 31, lines 7-9).

Further testimony in the record indicates the video clearly did not show a red block as is evinced by the testimony of two other witnesses. Fellow crew member DeMarco Lewis when questioned by the Claimant's representative about the video stated he could not see a red signal displayed in the video (Transcript page 51, lines 4-8). Another crew member at the investigation, Ms. Tangie L Wigley, stated that while she was present when the video was played at the investigation she also could not clearly see a red signal (Transcript page 53, lines 8-11). Due to the poor quality of the video and the fact that a majority of the parties in attendance at the investigation testified that they could not see a red block in the video it is apparent that the Carrier did not produce sufficient evidence to find the Claimant in violation of non-compliance with a red block. The Carrier did not prove its case.

This case is the second of two cases before this Board concerning the Claimant. The other case before this board for the Claimant is NRAB-00001-130404. In both cases before this board the Carrier assessed the discipline of dismissal to the Claimant. Should a sustaining award be rendered in any or all of these cases, the discipline assessed through the Carrier's PEPA Policy will need to be reviewed and adjustments made, including the possibility of reinstatement.

## CONCLUSION:

It is the conclusion of the Organization that the Claimant was denied his right to a fair and impartial investigation, and that the Carrier has not proven its case.

In Davis Fire Brick Co., 36 LA 124, 127 (Dworkin, 1960), (**BLET Exhibit H**), the court ruled:

> "Inherent in the contractual provision that an employee may be disciplined for just cause, is the fairness and reasonableness of the penalty. While the basis for discipline may be clearly established, unless the penalty is reasonably commensurate with the improper conduct of the employee, then "just cause" is wanting as regards the penalty imposed."

As such, the Organization's claim for all time lost with benefits restored is the appropriate remedy. The Board is urged to recognize that the discipline assessed in this case is far from commensurate with the Claimant's actions and that "just cause" is definitely wanting. As such, the Organization's claim for all time lost with benefits restored is the appropriate remedy. In this regard, we submit that our claim is supported in Rule 63 of the former CB&Q Schedule, (**BLET Exhibit D**) which requires employees working under this CBA who are not proven to be guilty as charged, "... *In case of unjust dismissal or discipline the engineer will be reinstated, paid for time lost and the record corrected...* ".

In the event that the Claimant is returned to service with back pay, it is the position of the Organization that the Carrier is without the right to offset earnings when the Carrier is required to pay a Claimant for time lost as a result of a wrongful suspension or dismissal. The Carrier's position is contrary to our on-property understandings and past practice. There is also a long arbitral history of requiring the payment of all wages lost *without* allowing any deduction for outside earnings, including awards from the First Division. We have shared many of these with the Carrier in the recent past. Please refer to our supplemental submission that was presented to PLB No. 5939. (Organization's Supplemental Submission to Public Law Board No. 5939 attached as **BLET Exhibit I**).

While the Carrier might introduce various Awards and Interpretations involving other crafts and other Carriers where deductions have been allowed, it has not provided any evidence to show that on this property. Absent any affirmative showing that such offsets were contemplated by the Organization's Schedules, it is improper in this craft to allow them, and it is improper herein.

Furthermore, if the Carrier makes any attempt to offset a claim by deducting for outside income earned during the period in question, we may request an interpretation of the Arbitrator's intent of the award. In the unlikely event that such offsets are provided to the Carrier, we may also request compensatory damages in return.

For each of the reasons stated above, we believe an award sustaining our position is in order and this Board is respectfully requested to so rule.

All information presented herein has been presented to the Carrier during the handling of this dispute on the property.

Respectfully submitted,

M. O. Wilson
General Chairman
Brotherhood of Locomotive Engineers and Trainmen
EGL